[No. 32305-2-II.   Division Two.   November 15, 2005.]

NORTH KITSAP SCHOOL DISTRICT, *Respondent*, v. K.W., *Appellant*.

*Randal B. Brown* (of *Randal Brown Law Office*), for appellant.

*Daniel C. Montopoli* and *William A. Coats* (of *Vandeberg, Johnson & Gandara*), for respondent.

¶1 VAN DEREN, A.C.J. — G.W. and C.W. (Grandparents), the legal guardians of K.W., a minor disabled student, sought an impartial due process hearing under 20 U.S.C. §§ 1400-1491, the Individuals with Disabilities Education Act (IDEA or Act). An administrative law judge (ALJ) found that (1) the North Kitsap School District (District) failed to

provide K.W. the "free appropriate public education" (FAPE) that he was entitled to under the Act for two academic years; and (2) the District must reimburse the Grandparents for two academic years of K.W.'s education, which included K.W.'s placement for one academic year at a private school (Glen Eden) for special education students. The District sought superior court review, and the trial court reversed the ALJ on all of these issues.

¶2 The Grandparents appeal, arguing that the trial court's reversal of the ALJ's decision failed to apply the proper standard of review and give appropriate deference to the ALJ. At trial the Grandparents also moved for a "stay put" order under the Act, which it granted. The District argues on appeal that the trial court erred in issuing the "stay put" order that has allowed K.W. to continue attending the private special education school during the pendency of our review.

¶3 We previously issued an opinion in which we reversed the trial court in part and affirmed the trial court in part. Before that previous opinion was published, both parties moved for reconsideration. We now grant reconsideration of portions of our former opinion, withdraw our former opinion and (1) affirm the trial court's finding that the District provided K.W. a FAPE for the 2001-2002 school year; (2) reverse the trial court's finding that the District provided a FAPE for the 2002-2003 school year; (3) hold that K.W.'s private placement at Glen Eden was appropriate for the 2003-2004 school year and affirm the trial court's "stay put" order; and (4) based on the time frame and issues presented in this appeal, we hold that the Grandparents are entitled to reimbursement for K.W.'s placement at Glen Eden during the ongoing litigation relating to K.W.'s appropriate educational placement.

## FACTS

¶4 K.W. is a disabled child who resides in the North Kitsap School District. He suffers from various disabilities,

including autism, attention deficit hyperactivity disorder, and other behavioral and cognitive disabilities. Consequently, K.W. is entitled to a FAPE under IDEA within the District. He attended District schools during his kindergarten, first, second, and third grades. K.W.'s Grandparents are his guardians and have always advocated for his education.

¶5 K.W. attended kindergarten at a public school for developmentally delayed students. In first grade, he attended public school half-time for most of the year and, by the end of the year, he attended public school two-thirds of the regularly scheduled time. He repeated first grade in 2000-2001 and attended public school full-time but spent half the day in a regular classroom and the remaining time in a special education room called the Resource Room 2 program. These facts are undisputed.

A. 2001-2002 School Year

¶6 In June 2001, the summer before the 2001-2002 school year, K.W.'s special education/IEP (Individualized Education Program) team recommended his assignment to the District's Summit One Program. At the time, the Summit One Program was in the developmental stage and was scheduled to begin in the 2001-2002 school year. This was a self-contained program that did not involve nondisabled students and was designed for students with behavioral problems.

¶7 The Grandparents and K.W.'s teacher attended the mandatory IEP meeting, as did other special education professionals. A Summit One Program teacher did not attend this meeting.

¶8 In September 2001, K.W.'s Grandmother observed K.W. in the Summit One program and met his teacher. The Summit One Program had eight disabled students. In October 2001, K.W.'s final IEP was due; however the Grandparents notified the District that they were in the process of obtaining a complete medical evaluation of K.W. to assist with the IEP.

¶9 In December 2001, the IEP team met without the Grandparents' medical evaluation to avoid further delay. K.W.'s Grandmother attended the IEP meeting and the IEP team completed an educational plan for K.W. The IEP team recommended specific modifications to the Summit One Program to address K.W.'s unique special education needs. K.W. completed the school year in the Summit One Program.

## B. 2002-2003 School Year

¶10 K.W.'s IEP team met again in June 2002, for the mandated periodic review of his special education program for the upcoming 2002-2003 academic year. 20 U.S.C. § 1414(d)(4). They determined that K.W. had made certain academic and behavioral progress in the Summit One Program during the past year but that unmet social goals remained. The District recommended that K.W. be removed from the Summit One Program out of concern for his safety, primarily because K.W.'s behavior could provoke other students to act violently toward him. The IEP team also agreed that (1) a neuropsychological medical evaluation was appropriate; and (2) that the IEP team would reconvene in August 2002, to complete K.W.'s special education program for the 2002-2003 academic year.

¶11 But the District did not hold a meeting in August. Thus, when the school year began, the Grandparents did not know where K.W. was expected to attend school. It is disputed whether the Grandparents first contacted the District or the District contacted them when K.W. did not enroll in the fall. But after contact was made, the District informed the Grandparents that K.W. would be placed in the Summit One Program again. Although the IEP team had recently found this program inappropriate for K.W.'s special education needs, the District stated that the program was now acceptable because only two students were enrolled and there was a high degree of supervision, mitigat-

ing the IEP team's safety concerns. No IEP team meeting occurred to discuss this decision.

¶12 The Grandparents chose not to return K.W. to the Summit One Program. In December 2002, the Grandparents requested an impartial due process hearing under 20 U.S.C. § 1415(b)(6) of the Act.

¶13 The District met with the Grandparents in February 2003. This was the first time that the District met with them since the IEP team meeting in June 2002. The District provided the Grandparents with two options for K.W.'s special education: (1) the Summit One Program or (2) Resource Room 3.[1] After visiting these programs, the Grandparents declined the District's offer.

¶14 A neurological evaluation was available by this time; but it did not include a complete analysis and it did not recommend a specific special education program appropriate to K.W.'s disabilities. At oral argument we learned that the District has not had an IEP meeting regarding K.W.'s special education since June 2002.

C. Procedural History

1. Administrative Proceedings

¶15 An ALJ associated with the Office of Administrate Hearings for the Superintendent of Public Instruction provided a due process hearing in April 2003. After two days of testimony,[2] the ALJ found that (1) the District failed to provide K.W. with a FAPE as required under the Act for both the 2001-2002 and 2002-2003 school years and (2) the Grandparents were entitled to an independent educational evaluation (IEE) for a neuropsychological examination of K.W. at public expense.

¶16 Because the District failed to provide a FAPE for K.W., the ALJ heard testimony about Glen Eden Institute,

---

[1] The record does not reveal the differences, if any, between the Summit One Program and the Resource Room 3 programs.

[2] The ALJ hearing included the testimony of the director and a teacher at Glen Eden, both Grandparents, and K.W.'s special education teacher from the District.

a private special education school located in Kitsap County. The ALJ concluded that it was an appropriate placement for K.W. during the 2003-2004 school year and ordered that K.W. attend it at public expense and that "[t]he District shall follow the requirements of the IDEA with regard to the Student's placement at Glen Eden." Clerk's Papers (CP) at 33.

¶17 The ALJ also determined that the Grandparents were entitled to an additional year of compensatory education at an institution to be determined at a later date. Thus, the ALJ ordered "one additional year of compensatory education to be determined by the IEP team prior to the end of the Student's year at Glen Eden." CP at 33.

¶18 The District moved for reconsideration, which the ALJ denied.

### 2. Trial Court Proceedings

¶19 The District filed an aggrieved party's civil action under 20 U.S.C. § 1415(i)(2) seeking judicial review of the ALJ's decision. The Grandparents moved for summary judgment, which the trial court denied. Following a hearing in which the trial court considered the District's submission of portions of depositions of Glen Eden's director and one of K.W.'s teachers for the 2003-2004 school year, the trial court issued a memorandum opinion reversing the ALJ's decision, except for the Grandparents' entitlement to an IEE. The District does not appeal the trial court's IEE ruling; but at oral argument we were informed that the IEE had not yet been completed.

¶20 The Grandparents filed a notice of appeal and requested that the trial court order that Glen Eden be the "stay put" placement while this matter was on appeal pursuant to 20 U.S.C. § 1415(j). After a hearing, the trial court granted the Grandparents' request. The District then brought a motion in this court to set aside the order. We treated the District's motion as a RAP 8.1(h) motion under the Grandparents' appeal and consolidated it with the other

issues before us. Thus, during the pendency of this appeal K.W. remained enrolled at Glen Eden.

## ANALYSIS[3]

### I. BACKGROUND

¶21 The Washington State Supreme Court has aptly summarized IDEA's purpose:

> The IDEA was enacted to address the special educational needs of disabled children. The act's purpose is "to *ensure that all children with disabilities have available to them a free appropriate public education* [FAPE] that emphasizes special education and related services *designed to meet their unique needs*. . . . " 20 U.S.C. § 1400(d)(1)(A). One goal of the IDEA is to provide comparable education to disabled students as that provided to nondisabled students. States that comply with the IDEA are entitled to federal funding to assist in the provision of a free appropriate public education to disabled children residing within the state. 20 U.S.C. § 1412.

*Tunstall v. Bergeson*, 141 Wn.2d 201, 228, 5 P.3d 691 (2000) (emphasis added).[4]

¶22 A FAPE under IDEA must be "in conformity with the individualized education program [IEP] required under section 1414(d) of this title." 20 U.S.C. § 1401(9)(D). A student's IEP is a written program developed by a multidisciplinary team that must include the child's parents or guardians, teachers, and special education professionals. 20 U.S.C. § 1414(d). The IEP team establishes annual and short-term special education goals and the location of appropriate services. 20 U.S.C. § 1414(d). The Act requires the IEP team to review the disabled students'

---

[3] There is little Washington case law discussing these issues. We therefore rely on United States Supreme Court and federal court authority that consistently and routinely interprets IDEA.

[4] *Tunstall v. Bergeson* is the only Washington case substantively discussing IDEA. But it does not assist in our analysis because it concerns *prison inmates'* claims that they were improperly denied special education under the Act. 141 Wn.2d at 228.

special education program at least annually. 20 U.S.C. § 1414(d).

■ ¶23 The school district has the ultimate duty to provide a special education student a FAPE under the Act. *See Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1522 (9th Cir. 1994); *W.G. v. Bd. of Trustees of Target Range Sch. Dist. No. 23*, 960 F.2d 1479, 1486 (9th Cir. 1992) ("the statute [IDEA] places the responsibility for the IEP process in the hands of the state and local education agencies"); *Bd. of Educ. v. Rowley*, 458 U.S. 176, 207, 102 S. Ct. 3034, 73 L. Ed. 2d 690 (1982). The Act contains a detailed system of procedural protections to ensure that a disabled student is not denied a FAPE. The disabled student's parent or guardian can request that an "impartial due process hearing" be conducted by the appropriate State educational agency to challenge "any matter relating to" the school's evaluation of the child's IEP or FAPE entitlement. 20 U.S.C. § 1415(f)(1), (b)(6)(A). "Any party aggrieved by the findings and decision" of this due process hearing can bring a civil action "in *any State court* of competent jurisdiction *or* in a district court of the United States, without regard to the amount in controversy." 20 U.S.C. § 1415(i)(2)(A) (emphasis added).

II. STANDARD OF REVIEW

¶24 The Grandparents contend that the trial court did not apply the proper standard of review because it failed to defer to the ALJ's extensive factual findings. The District responds that the trial court correctly applied a "virtually de novo" standard. Br. of Resp't at 12 (quoting *Teague Indep. Sch. Dist. v. Todd L.*, 999 F.2d 127, 131 (5th Cir. 1993)).

■ ¶25 The standard of review here is unique because when the aggrieved party seeks review of an ALJ's due process hearing, the trial court can receive the administrative record, but it can also "hear additional evidence" and base its final decision on "the preponderance of the evidence." 20 U.S.C. § 1415(i)(2)(C)(ii)-(iii); *see also* WAC 392-172-360(2).

¶26 An appellate court reviews a trial court's factual findings "for clear error even when they are based on the written record of administrative proceedings." *Amanda J. v. Clark County Sch. Dist.*, 267 F.3d 877, 887 (9th Cir. 2001). A clear error is "when the evidence in the record supports the finding but 'the reviewing court is left with a definite and firm conviction that a mistake has been committed.' " *Amanda J.*, 267 F.3d at 887 (quoting *Burlington N., Inc. v. Weyerhaeuser Co.*, 719 F.2d 304, 307 (9th Cir. 1983)).

¶27 But both trial and appellate courts review de novo whether a school district provided the disabled student a FAPE. *Amanda J.*, 267 F.3d at 887. "Complete de novo review, however, is inappropriate." *Amanda J.*, 267 F.3d at 887.

¶28 As the Ninth Circuit recently stated:

> [W]e are *not* free "to substitute [our] own notions of sound educational policy for those of the school authorities which [we] review." *Rowley*, 458 U.S. at 206, 102 S. Ct. 3034. Because Congress intended states to have the primary responsibility of formulating each individual child's education, we *must* defer to their "specialized knowledge and experience" by giving *"due weight"* to the decisions of the *states' administrative bodies. Id.* at 206-08, 102 S. Ct. 3034.

*Amanda J.*, 267 F.3d at 887-88 (emphasis added) (second and third alterations in original).

¶29 Further, "[t]he amount of deference accorded the hearing officer's findings increases where they are 'thorough and careful.' " *Capistrano Unified Sch. Dist. v. Wartenberg*, 59 F.3d 884, 891 (9th Cir. 1995) (ALJ decision of 26 single spaced pages covering 10 days of testimony) (quoting *Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1524 (9th Cir. 1994)). And such deference to the administrative proceedings applies to both trial and appellate courts. *See Wartenberg*, 59 F.3d at 892 ("The district court's independent judgment is not controlled by the hearing officer's recommendations, but neither may it be made without due deference."); *Smith* 15 F.3d at 1524 ("We, like the district court, however, 'must give "due weight" ' to judg-

ments of education policy when [we] review state hearings.") (alteration in original) (quoting *Gregory K. v. Longview Sch. Dist.*, 811 F.2d 1307, 1311 (9th Cir. 1987)).

¶30 Thus, we review the trial court's factual findings for clear error. We review de novo whether the District's FAPE plan is appropriate, but we give deference to the ALJ's findings and we do not make educational policy determinations. And heightened deference is required here because the ALJ's decision was thorough and careful as evidenced by 21 pages of findings following two days' testimony.

¶31 Here, the superior court generally articulated the proper standards of review, but it did not thoroughly implement them. For example, the trial court committed two specific errors. First, the superior court failed to properly defer to the ALJ's detailed findings regarding the District's procedural violations of the Act, such as the significance of the District's failure to provide an IEP in August 2002, before the 2002-2003 school year. The District emphasizes K.W.'s IEP in December 2001, which addressed concerns about K.W.'s problems in the Summit One Program. But by June 2002, the District had determined and communicated to the Grandparents that Summit One Program was not appropriate for K.W and the IEP team required further discussion in August. The District failed to follow through and verify K.W.'s educational needs and placement for the 2002-2003 school year.

¶32 Second, the trial court's standard of review section fails to mention that the court should not make educational policy judgments. This is particularly relevant because the trial court's decision focused on whether Glen Eden was an appropriate school for K.W.'s special education needs without a detailed discussion of the evidence it considered, including, only in part, the deposition testimony of two Glen Eden staff. The trial court also failed to articulate that courts are generally required to defer to the ALJ's expertise in educational policy matters.

¶33 Thus, we are left with a definite and firm conviction about error in the trial court's factual findings. We next

address the merits of the Grandparents' arguments with the foregoing standards of review in mind.

### III. DISTRICT'S FAPE FOR K.W.

¶34 The Grandparents contend that we should affirm the ALJ's decision in all respects.

¶35 Courts employ a two-part test when reviewing whether a district has provided a disabled student an appropriate FAPE under the Act: " 'First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?' " *M.L. v. Fed. Way Sch. Dist.*, 394 F.3d 634, 644 (9th Cir. 2004) (quoting *Rowley*, 458 U.S. at 206-07).

¶36 The school district must satisfy *both* inquiries; thus, if the district fails the first procedural requirement, the court may cease analysis and determine that the district violated the Act. *Amanda J.*, 267 F.3d at 892, 894. And as previously discussed, the school district bears the ultimate responsibility of satisfying the disabled student's special education needs.

### A. Procedural Requirements

¶37 The procedural requirements are rigorous. *M.L.*, 394 F.3d at 646. Thus, " 'procedural inadequacies that result in the loss of educational opportunity, or seriously infringe on the parents' opportunity to participate in the IEP formulation process, clearly result in the denial of a FAPE.' " *M.L.*, 394 F.3d at 645 (quoting *W.G.*, 960 F.2d at 1484). The Act's procedural requirement that a disabled child's parents be involved in the IEP process are vital primarily because "parents fight for what is in their child's best interests [and] they observe their children in a multitude of different situations, they have a unique perspective of their child's special needs." *Amanda J.*, 267 F.3d at 891. Thus, "[p]rocedural violations that interfere with

parental participation in the IEP formulation process undermine the very essence of the IDEA. An IEP which addresses the unique needs of the child cannot be developed if those people who are most familiar with the child's needs are not involved or fully informed." *Amanda J.*, 267 F.3d at 892.

### 1. Neuropsychological Evaluation

¶38 The Grandparents' central argument is that the ALJ's order that the District must provide an IEE for a neuropsychological evaluation demonstrates that the District never completely understood K.W.'s disability. They emphasize that the trial court upheld this portion of the ALJ decision and, thus, the District's misunderstanding of K.W. precluded its ability to propose an appropriate FAPE.

¶39 We reject this overbroad contention. The IEP team determined the need for a neuropsychological evaluation of K.W. *at the end* of the 2001-2002 school year. Further, the ALJ's order for the IEE was not the primary basis for its finding that the District violated IDEA's special education requirements. Rather, the ALJ's decision turned on errors discussed below.

### 2. 2001-2002 School Year

¶40 Relying on *W.G.*, the ALJ found that the District's FAPE was so procedurally erroneous that it violated IDEA's special education requirements. Specifically, the ALJ faulted the District for not including a Summit One Program teacher at the June 2001 IEP meeting and that the District staff had already decided to place K.W. in the Summit One Program before this meeting. The ALJ concluded that these procedural errors made it "impossible for the Grandparents to obtain the information they needed about the program that was being offered in order to provide meaningful input." CP at 26.

¶41 But to constitute a violation of IDEA, a school district's procedural error must seriously infringe on the parents' ability to participate in the IEP formation process

and cause the loss of appropriate educational opportunities for the child. The record demonstrates that one Grandparent was actively involved in helping to make the Summit One Program work throughout the 2001-2002 school year. Indeed, one Grandparent observed classes, which led to substantive improvements for K.W. for the remainder of the academic year. Further, in June 2001, the District had a reasonable belief that the self-contained Summit One Program could be beneficial to K.W.'s special education needs. K.W. participated in the program for the entire academic year and the program was successful in certain areas. *W.G.* is distinguishable because it involved a school district's failure to incorporate both the student's teacher and private school representatives. 960 F.2d at 1484. Here, only the Summit One Program teacher was absent and the District representatives who were present, including K.W.'s former teacher, were knowledgeable about the Summit One Program.

¶42 Thus, even giving due deference to the ALJ's findings, the record does not support the determination that the District failed to provide a FAPE because of a serious procedural error during the 2001-2002 school year. We affirm the trial court's ruling regarding this school year.

### 3. 2002-2003 School Year

■ ¶43 The ALJ also found that the District's procedural errors in the IEP process were so serious that they deprived K.W. of his FAPE for the 2002-2003 school year. The ALJ based this finding on (1) the District's failure to convene an IEP meeting at the beginning of the academic year, and (2) the District's belated offer to again place K.W. in the Summit One Program already deemed inappropriate for his disability.

¶44 The ALJ found:

In June 2002 the Grandparents attended a meeting where they were told that the Student[']s placement in the Summit One program was inappropriate[,] that the Student needed further neurological testing[,] and that an IEP meeting would

be convened prior to the commencement of the next school year to determine a placement for the Student. The District failed to convene an IEP meeting. . . .

In this case the consequence was that the Grandparents were offered a placement at Summit One [in August 2002] that they had been told by the District was inappropriate and were not again contacted for over four months. The District's action and inaction both infringed upon the Grandparents['] opportunity to participate in the IEP formulation process as well as denied the Student educational opportunity.

CP at 28-29.

¶45 Because of these procedural errors, K.W. did not receive any special education for the 2002-2003 school year. Significantly, the District's appellate brief simply ignores these facts the record supports. Instead, the District argues that it procedurally complied with IDEA's requirements for the 2002-2003 school year because the results of the December 2001 meeting about K.W.'s progress in the Summit One Program was never amended. This argument is highly unpersuasive because it ignores the consequence of the June 2002 IEP meeting and improperly elevates form over substance. *See also W.G.*, 960 F.2d at 1485 (emphasizing that the school district "failed to fulfill the goal of parental participation in the IEP process and failed to develop a complete and sufficiently individualized educational program according to the procedures specified by the Act").

¶46 Thus, we agree with the ALJ that the District's procedural errors were serious and deprived K.W. of his FAPE for the 2002-2003 school year. We reverse the trial court and reinstate the ALJ's rulings regarding the 2002-2003 school year.

B. Substantive Requirements

¶47 Regarding the second prong, the school district's FAPE is acceptable if it "(1) addresses the child's unique needs, (2) provides adequate support services so the child can take advantage of the educational opportunities,

and (3) is in accord with the individualized education program." *Wartenberg*, 59 F.3d at 893. A school district's FAPE need only substantially comply with the Act:

> "An 'appropriate' public education does not mean the absolutely best or 'potential-maximizing' education for the individual child. . . . The states are obliged to provide 'a basic floor of opportunity' through a program 'individually designed to provide educational benefit to the handicapped child.'"

*Smith*, 15 F.3d at 1524 (quoting *Gregory K.*, 811 F.2d at 1314 (quoting *Rowley*, 458 U.S. at 201)).

¶48 The Grandparents contend that we should affirm the ALJ's findings that the District's FAPE for both the 2001-2002 and 2002-2003 school years were substantively deficient.

### 1. 2001-2002 School Year

¶49 The ALJ ruled that the District's FAPE was substantively deficient for this school year because (1) K.W.'s behavioral problems increased outside the classroom, and (2) he was in an environment where he was subject to teasing and aggression by other students.

¶50 But the ALJ acknowledged that K.W. made behavioral progress in the classroom and a teacher testified that he was making academic progress. The Summit One Program was a self-contained program specifically designed to address behavioral needs for students with disabilities. After evaluating K.W.'s progress in December 2001, the Summit One Program staff made significant adjustments in K.W.'s program to improve K.W.'s chances of success. For example, they added specially designed instruction for behavior intervention and speech therapy.

¶51 Regarding the ALJ's finding that K.W. was subject to teasing, any harassment by other students must be serious enough to cause "the loss of an educational benefit" in order to constitute a substantive IDEA violation. *M.L.*, 394 F.3d at 651. Further, like in *M.L.*, the Grandparents "have not

directed this court's attention to any violence, or threat of physical contact between another student and [K.W.]." 394 F.3d at 651.

¶52 The District's program need not be perfect; rather it must generate some educational benefit tailored to K.W.'s unique needs. The record demonstrates that the District did provide a special education program to meet some of K.W.'s educational and in-school behavioral needs in 2001-2002. Under these circumstances, we do not find the ALJ's conclusion that the District's program did not reduce K.W.'s behavioral problems outside the classroom or that he was subject to aggression or teasing at school persuasive enough to conclude that the District violated K.W.'s FAPE opportunities in 2001-2002.

¶53 Thus, we affirm the trial court's determination that the District's FAPE for the 2001-2002 school year was not substantively deficient.

### 2. 2002-2003 School Year

¶54 As previously discussed, the District denied K.W. his FAPE through significant procedural violations of the Act. The District's procedural error precludes our inquiry of substantive issues relating to the District's FAPE. Indeed, K.W. received no education during this academic year.

¶55 Thus, we reverse the trial court's finding that the District provided K.W. a FAPE for the 2002-2003 school year.

### IV. K.W.'s PLACEMENT AT GLEN EDEN

¶56 The District vigorously asserts that the Glen Eden Institute is an inappropriate facility for K.W.'s special education needs. The ALJ's order required the District to reimburse the Grandparents for one school year of K.W.'s placement at Glen Eden. It was hotly contested at oral argument before this court whether the District even now can provide an appropriate placement for K.W., especially given that K.W. has neither an updated IEP nor a new IEE.

¶57 "Parents have an equitable right to reimbursement for the cost of providing an appropriate education when a school district has failed to offer a child a FAPE." *W.G.*, 960 F.2d at 1485 (citing *Burlington Sch. Comm. v. Mass. Dep't of Educ.*, 471 U.S. 359, 369-70, 105 S. Ct. 1996, 85 L. Ed. 2d 385 (1985)). Courts review de novo the appropriateness of the new placement in the same way they examine whether a school district's proposed FAPE is satisfactory. *W.G.*, 960 F.2d at 1487.

¶58 As the Ninth Circuit has emphasized, the court's appropriateness inquiry requires deference to the ALJ's determination given the important educational policy concerns that:

> [W]e must also decide whether the placement proposed by the District later that year was "appropriate". . . . This issue more than most others in the case involves educational policy. The "due weight" that courts must give to the state education agency's findings on matters of educational policy should prompt courts in the future to provide a more thorough explanation when *reversing* an agency's ruling on the appropriateness of a special education placement.

*Gregory K.*, 811 F.2d at 1314 (emphasis added).

¶59 The ALJ's findings of fact regarding Glen Eden state:

> Glen Eden has served children under contract with public school districts in Washington[,] but not the [North Kitsap] District. . . . The [Glen Eden] program is designed to serve children with complex medical[,] psychological[,] educational[,] or learning problems contributing to their inability to succeed in other school settings. Initially [ ] staff take data on a student in intervals as short as every minute but usually every six minutes. As the students become higher functioning the staff increases the intervals up to 30 minutes. The staff monitor[s] the arousal state of the students to keep track of how they are responding to their environment. With the data the staff attempts to predict a student's behavior and modify the situation as needed. Each student's program is designed for his or her specific needs . . . . Staff at Glen Eden have met with the

Student [K.W.] and have determined that he could be appropriately served by its program.

CP at 23-24.

¶60 The ALJ's conclusions of law state:

Therefore based upon the testimony of Glen Eden staff, Glen Eden is determined to be the appropriate placement for the Student for the 2003-2004 [school year]. It is understood that this is a prospective placement and not purely a matter of reimbursement. However[,] in light of the Student not receiving a FAPE for two years and the District's failure to propose an appropriate placement, it is not the obligation of the ALJ to find a placement for the Student when an appropriate placement has been offered by the Grandparent[s].

*While the Student is placed at Glen Eden the District shall be responsible for meeting the requirements of the IDEA* and pursuant to applicable regulation as though the Student was placed by the District. Further, the Grandparents shall fully cooperate with the District as necessary for it to meet its obligations under the law.

CP at 32 (emphasis added).

¶61 Here, the trial court's rejection of the ALJ's determination that Glen Eden was an appropriate placement for K.W. was based primarily on limited and selected deposition testimony submitted by the District. The trial court's decision is an educational policy judgment without adequate support and without consideration of the deference due the ALJ's thorough and careful findings and the ALJ's special expertise.

¶62 For example, the trial court faulted Glen Eden for not having a certified special education teacher in compliance with chapter 392-172 WAC. But numerous Glen Eden staff worked with K.W. that were not deposed and the teacher's deposition states her years of experience with students who share K.W.'s disabilities. And this finding ignores the undisputed fact that the State has certified Glen Eden as a program for disabled children and that other districts outside Kitsap County contract with the school. Further, even a school's lack of certification is not a

dispositive reason to find a private placement inappropriate under IDEA. *See Smith*, 15 F.3d at 1526 ("[w]hen a parent places a child in a private setting, reimbursement may be ordered even though the private institution does not satisfy the state education standards").

¶63 The trial court also faulted Glen Eden's philosophy toward special education, implying, as does the District's appellate brief, that K.W. merely played games all day and was not evaluated through standard academic measures. Again, such educational policy judgments are not necessarily dispositive, especially when based on incomplete depositions. *See W.G.*, 960 F.2d at 1487 ("Standardized tests are not the sole indicator of a student's progress. The Act does not require as much.").

¶64 As previously discussed, in evaluating the appropriateness of Glen Eden, we must employ de novo review and give deference to the ALJ's factual findings because the ALJ has the expertise to make educational policy judgments and the ALJ has benefited from hearing live testimony. *W.G.*, 960 F.2d at 1483; *Gregory K.*, 811 F.2d at 1314. And we are mindful that the Grandparents' right to reimbursement here falls under the court's equitable powers. *W.G.*, 960 F.2d at 1485.

¶65 Our inquiry into the appropriateness of the Glen Eden placement is difficult because neither party has fully complied with the ALJ's order. At the time of oral argument, the Grandparents had not obtained an IEE (neuropsychological evaluation) to help the IEP team develop K.W.'s IEP.

¶66 But K.W.'s special education under the Act is ultimately the District's responsibility and the record demonstrates that the District failed to comply with the ALJ's order to provide an updated IEP to Glen Eden for the 2003-2004 school year. Thus, it is disingenuous for the District to consistently criticize Glen Eden for using an older IEP when the District has failed to cooperate with Glen Eden or the Grandparents to develop a new one. And nothing in the record demonstrates that the District has

formally proposed any meaningful alternative to Glen Eden.

¶67 Further, Glen Eden must provide only a "basic floor of opportunity" for a special education program that is "reasonably calculated" to satisfy K.W.'s unique education needs. *Smith*, 15 F.3d at 1524; *Gregory K.*, 811 F.2d at 1314. Here, the record demonstrates that K.W.'s education at Glen Eden during the 2003-2004 school year satisfied the Act.

¶68 For example, the evidence before the ALJ and the trial court demonstrates that (1) Glen Eden thoroughly reviewed K.W.'s file before placement, and staff were qualified to assess K.W.'s special education needs; (2) Glen Eden provided special education for other Washington school districts; (3) Glen Eden's "arousal" approach can be an effective, one-on-one method to resolve a student's severe behavioral issues; (4) Glen Eden staff includes two doctors trained in special education, plus three full time teachers, and two part-time teachers with experience with special needs students; (5) Glen Eden initially focused on K.W.'s emotional and behavioral needs but also included mathematics, science, reading, writing, and spelling activities.

¶69 The District's response to these facts is unpersuasive. The District strenuously criticizes Glen Eden's curriculum by submitting partial deposition testimony from Glen Eden's director and one of K.W.'s teachers. But the District's evidence is incomplete and artfully omits large portions of testimony involving Glen Eden's evaluation of K.W., the school's assessment of his reading goals, and the curriculum.[5] The ALJ found that Glen Eden employed one-on-one instruction and did not find Glen Eden's arousal approach to be controversial. And as previously discussed, the District's criticism of Glen Eden's use of an older IEP for K.W. evades the District's ultimate responsibility to develop a more current IEP in compliance with the Act or propose a

---

[5] The deposition of K.W.'s teacher is missing 30 pages. Glen Eden's director's deposition is so incomplete that its total length is unknown, although 30 pages are missing from what the District submitted.

meaningful special education program. Again, the District has failed to initiate both options.

¶70 Thus, the trial court's finding that Glen Eden is an inappropriate placement for K.W. leaves us with a definite and firm conviction that a mistake has occurred and the trial court's decision is consequently erroneous. *Amanda J.*, 267 F.3d at 887. Given our heightened deference to the ALJ's factual findings and balancing the equities of the circumstances here, we hold that Glen Eden was an appropriate placement for K.W. during the 2003-2004 school year. We reverse the trial court and reinstate the ALJ's order requiring the District to reimburse the Grandparents $4,500 per month for K.W.'s placement at Glen Eden for the 2003-2004 school year.[6]

## V. "STAY PUT" ORDER

¶71 The District argues that the trial court erred when it ordered that K.W. can "stay put" at Glen Eden under 20 U.S.C. § 1415(j), through the pendency of our review.[7] The District argues that 20 U.S.C. § 1415(j) is limited to administrative and trial court proceedings and that the trial court lacked jurisdiction to issue the "stay put" order. The Grandparents argue in their reconsideration memorandum that the "stay put" order was absolutely necessary

---

[6] Given our holding, it is not necessary to review the Grandparents' argument that the trial court mischaracterized their placement of K.W. in Glen Eden as a unilateral removal from the District's program. But we note without holding that the trial court's characterization appears unpersuasive given the District's significant procedural errors during the 2002-2003 school year that denied K.W. a FAPE.

[7] We note that the District's argument that the trial court was without jurisdiction to issue the "stay put" order is unpersuasive. Based exclusively on a selective presentation of the Rules of Appellate Procedure, the District makes technical arguments that the trial court improperly acted *after* this court accepted review. But the District ignores our broad authority to expand the trial court's ability to determine postjudgment motions. *See, e.g.*, RAP 7.2(e) ("If review of a postjudgment motion is accepted while the appellate court is reviewing another decision in the same case, the appellate court may on its own initiative or on motion of a party consolidate the separate reviews as provided in rule 3.3(b)."). Further, we treated the District's challenge to the trial court's stay put order as a RAP 8.1(h) motion and consolidated it with review of the issues previously discussed.

during the pendency of the appeal because of K.W.'s special needs. They point out that since the District withheld tuition payments to Glen Eden, a reversal of the trial court's "stay put" ruling would effectively require them to pay for the schooling the ALJ authorized and ordered. Further, they contend that they should not be penalized for relying on the trial court's "stay put" order.

¶72 Parents are entitled to a preliminary injunction preserving the child's placement during a placement dispute unless the District can "demonstrate that the application of the traditional preliminary injunction criteria warrant a different result." *Henry v. Sch. Admin. Unit No. 29,* 70 F. Supp. 2d 52, 58 (D.N.H. 1999). IDEA's stay-put provision provides:

> Except as provided in subsection (k)(7) of this section, during the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of such child, or, if applying for initial admission to a public school, shall, with the consent of the parents, be placed in the public school program until all such proceedings have been completed.

20 U.S.C. § 1415(j).

¶73 The statute, however, does not define "proceedings conducted pursuant to this section." We are aware that in *Anderson v. District of Columbia,* the trial court specifically held that Congress did not intend for "stay put" orders to continue through the appellate process. 278 U.S. App. D.C. 230, 877 F.2d 1018, 1023 (1989) ("Thus, although an appeal is part of a 'civil action,' Congress's focus appears to have been on the trial stage of the proceeding.").

¶74 But the holding in *Anderson* does not follow the general policy behind IDEA, which is to keep from disturbing the child throughout the statutory process designed to resolve disputes between the school district and the child's parents or guardians over where the child can receive the appropriate educational opportunities. Essentially, the *Anderson* decision suggests that a school district's

maximum exposure to the costs of private special education is only through the trial court proceedings. 877 F.2d at 1023. Thereafter it need not pay additional costs of a private school placement for the child, even if the dispute over the child's placement continues. The practical effect of such a rule is that parents must remove their child from his or her current private placement and put him or her in an arguably inappropriate setting for the duration of any appeal process. Only parents with significant financial means could keep their child in the private setting. Under these circumstances, those unable to afford a private placement find their child's education again disrupted and their opportunity to successfully advocate for their child foreclosed or significantly curtailed. The court in *Susquenita School District v. Raelee S.*, stressed the importance of the parent's choice when it stated: "Without interim financial support, a parent's 'choice' to have his child remain in what the state has determined to be an appropriate private school placement amounts to no choice at all." 96 F.3d 78, 87 (3d Cir. 1996). Thus, we read the intent of the IDEA to allow parents the right to a "stay put" order throughout the *entire* process, including any appeals.

¶75 A further basis exists for requiring the District to pay for K.W.'s expenses incurred at Glen Eden. The court in *Henry*, stated: "[I]f a local educational agency refuses to pay for the proposed interim placement but the parents obtain an order from the state educational agency approving the placement, the school district must pay for the placement from the date of the agency decision . . . even if a . . . court reviewing the decision later rules in the School District's favor." 70 F. Supp. 2d at 59. The Third Circuit Court of Appeals also spoke to this issue in *Raelee S.*, stating that: "[T]he school district's financial responsibility should begin when there is an administrative or judicial decision vindicating the parents' position." 96 F.3d at 86.

¶76 Under *Raelee S.* and *Henry*, the District is required to pay for K.W.'s Glen Eden tuition. The ALJ order specifically required one year of placement at Glen Eden

and ordered the District and Grandparents to work to-
gether to subsequently determine K.W.'s educational place-
ment for the following year. Furthermore, when the school
district and the Grandparents demonstrated that they were
unable to cooperatively complete a new IEP for K.W. or to
reach agreement on his appropriate placement in a public
school setting, the trial court issued an order requiring
K.W. to "stay put" at Glen Eden while the matter was on
appeal. Thus, the trial court did not err in ordering K.W. to
"stay put" at Glen Eden to avoid educational disruption
while the litigation between the District and his Grandpar-
ents continued and we hold that Glen Eden was an appro-
priate placement for each year that K.W. attended Glen
Eden.

¶77 We affirm in part and reverse in part. We reiterate
our holdings for clarity:[8] (1) we affirm the trial court's
finding that the District provided K.W. a FAPE for the
2001-2002 school year; (2) we reverse the trial court's
finding that the District provided a FAPE for the 2002-2003
school year; (3) under the unique circumstances here, we
hold that K.W.'s private placement at Glen Eden was
appropriate for the 2003-2004 school year and affirm that
the "stay put" order was also proper; and (4) based on the
time frame and issues presented in this appeal, we hold
that the Grandparents are entitled to reimbursement for
K.W.'s placement at Glen Eden during the ongoing litiga-
tion relating to K.W.'s appropriate educational placement.

HOUGHTON and BRIDGEWATER, JJ., concur.

Review denied at 157 Wn.2d 1018 (2006).

---

[8] We recognize that K.W.'s ongoing and future special education is not before us.
However, for K.W.'s benefit, both parties to this long dispute need to put aside
their differences. The District must recognize its ultimate responsibility to
develop an appropriate IEP for K.W. and the Grandparents must obtain an
appropriate neuropsychological evaluation (IEE).