**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| LOS ANGELES UNIFIED SCHOOL DISTRICT, | Nos. 22-55204 22-55226 |
| *Plaintiff-Appellant / Cross-Appellee*, v. | D.C. No. 2:21-cv-00757-ODW-PD |
| A.O., a minor, by and through her parents, Kateri and Alex Owens, | OPINION |
| *Defendant-Appellee / Cross-Appellant*. | |

Appeals from the United States District Court
for the Central District of California
Otis D. Wright II, District Judge, Presiding

Argued and Submitted June 7, 2023
Pasadena, California

Filed February 15, 2024

Before: MILAN D. SMITH, JR., DAVID F.
HAMILTON,[*] and DANIEL P. COLLINS, Circuit Judges.

---

[*] The Honorable David F. Hamilton, United States Circuit Judge for the U.S. Court of Appeals for the Seventh Circuit, sitting by designation.

Opinion by Judge David F. Hamilton;
Dissent by Judge Collins

## SUMMARY[**]

### Individuals with Disabilities Education Act

The panel affirmed in part and reversed in part the district court's summary judgment affirming in part and reversing in part an administrative law judge's decision in an action brought under the Individuals with Disabilities Education Act by A.O., a child with profound hearing loss who has cochlear implants.

The panel affirmed the district court's affirmance in large part of the administrative law judge's decision, which held that Los Angeles Unified School District's proposed individualized education program for A.O. violated the IDEA. The panel held that: (1) the school district violated the IDEA by failing to specify clearly the frequency and duration of proposed speech therapy and audiology services; (2) the school district's proposed program failed to offer a meaningful educational benefit to A.O.; and (3) the proposed program failed to place A.O. in the least restrictive environment appropriate for her.

Reversing in part and remanding, the panel held that the school district's proposed program also violated the IDEA by failing to provide for individual speech therapy. The

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

panel thus effectively affirmed the decision of the administrative law judge on all issues.

Dissenting, Judge Collins wrote that the school district's proposed individualized education program did not deny A.O. a free appropriate public education by using unduly broad frequency ranges in describing how often particular services would be provided to A.O., nor by failing to specify that A.O.'s speech and language services would be provided in a strictly individualized setting. Judge Collins also disagreed with the majority's conclusions that the proposed program would not have provided A.O. with meaningful educational benefit and would not have placed her in the least restrictive environment.

**COUNSEL**

Mary Kellogg (argued), Los Angeles Unified School District Office of the General Counsel, Los Angeles, California; Lyndsy B. Rodgers, Fagen Friedman & Fulfrost LLP, Los Angeles, California; Lynn M. Beekman, Fagen Friedman Fulfrost LLP, Carlsbad, California; David R. Mishook, Fagen Friedman Fulfrost LLP, Oakland, California; for Plaintiff-Appellant.

David M. Grey (argued), Grey & Grey, Santa Monica, California; Valerie Vanaman, Janeen Steel, and Eric Menyuk, Vanaman German LLP, Sherman Oaks, California; for Defendant-Appellee.

Sue Ann S. Evans, Meagan M. Kinsey, and Dannis W. Kelley, Dannis Woliver Kelley, Long Beach, California; Keith J. Bray, Education Legal Alliance of the California School Boards Association, West Sacramento, California;

for Amicus Curiae Education Legal Alliance of The California School Boards Association.

Selene A. Almazan-Altobelli, Council of Parent Attorneys and Advocates, Towson, Maryland; Ellen M. Saideman, Law Office of Ellen Saideman, Barrington, Rhode Island; for Amici Curiae Council of Parent Attorneys and Advocates, Inc., Disability Rights Legal Center, and Learning Rights Law Center.

Maureen R. Graves, California Association for Parent-Child Advocacy (CAPCA), Chicago, Illinois, for Amicus Curiae California Association of Parent-Child Advocacy.

## OPINION

HAMILTON, Circuit Judge:

These appeals present both substantive and procedural issues under the federal Individuals with Disabilities Education Act as applied to a child with profound hearing loss who has cochlear implants. Unlike hearing aids, cochlear implants do not amplify sound. Instead, they directly stimulate the recipient's auditory nerves. Once a deaf child receives cochlear implants, she can begin the process of language learning that, for typically hearing children, begins at birth. Because children with cochlear implants were deprived of sound at a young age, they need as much exposure to language as possible so that they can catch up to their typically hearing peers.

Defendant A.O. was born with profound hearing loss in both ears. When she was not quite two years old, she received cochlear implants that, with time and practice,

should allow her to enjoy full abilities to listen to language and speak. As A.O. approached her third birthday, her parents and plaintiff Los Angeles Unified School District conferred to develop an individualized education program for A.O. under the federal Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq.*, also known as the IDEA. A.O.'s parents were ultimately not satisfied with the school district's proposed program, so they filed a due process complaint with the California Office of Administrative Hearings.

An administrative law judge held a six-day evidentiary hearing and in the end agreed on most issues with A.O.'s parents. The judge found that the school district's proposed program failed to specify the duration and frequency of services, would not provide A.O. a meaningful benefit, and would not place her in the least restrictive environment appropriate for her. The judge ordered the school district to pay for A.O. to attend a private school in Los Angeles with a program geared to help A.O. catch up to her peers in language skills.

The school district then filed this action in federal court under the IDEA asserting that the administrative law judge had made legal and factual errors. The district court affirmed the vast majority of the administrative law judge's decision but agreed with the school district that the individualized education plan for A.O. did not need to specify whether she would receive individual speech therapy.

The school district has appealed to this court, and A.O. and her parents have cross-appealed on that one issue of individual speech therapy. We affirm on all issues where the district court agreed with the administrative law judge. We

reverse on the defendants' cross-appeal.  We thus effectively affirm the decision of the administrative law judge on all issues presented in these appeals.

## I.  *Statutory Framework*

The IDEA was enacted "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A).  In exchange for federal funds, states agree to provide a "free appropriate public education"—known to the cognoscenti as a "FAPE," rhyming with "tape"—to all children with disabilities residing in the state from ages 3 to 21. § 1412(a)(1)(A).

To provide each eligible student with an appropriate education, school districts work with parents to develop an individualized education program for each child with disabilities.  *K.D. ex rel. C.L. v. Dep't of Educ.*, 665 F.3d 1110, 1114 (9th Cir. 2011).  The individualized program should assess the child's current academic performance, articulate measurable educational goals, and specify the nature of the special education and services the school district will provide. 20 U.S.C. § 1414(d)(1)(A)(i).  The Act requires substantively that the individualized program be "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F. ex rel. Joseph F. v. Douglas County School Dist. RE-1*, 580 U.S. 386, 403 (2017).

If parents and school officials disagree regarding the child's individualized program, the IDEA provides for dispute resolution procedures.   The parties are first encouraged to resolve their dispute through mediation. 20

U.S.C. § 1415(e). If mediation fails, parties are entitled to an impartial due process hearing conducted by the local or state educational agency. § 1415(f)(1)(A). Any party dissatisfied with the outcome of the state administrative hearing may seek review in a federal district court. § 1415(i)(2)(A).

II. *Factual Background*

A.O. was born in January 2017 with profound hearing loss in both ears. In December 2018, she received cochlear implants, which were activated in January 2019. Shortly after she received her cochlear implants, A.O.'s speech and language ability was assessed by a speech and language pathologist at the University of California, Los Angeles. That assessment indicated that A.O. was severely delayed in all aspects of spoken language development. With appropriate services and support, however, her prognosis for reaching age-appropriate auditory, speech, and language skills was "excellent."

In October 2019, when A.O. was approaching her third birthday, her parents enrolled her on a trial basis at the John Tracy Center (JTC), a nonpublic school. JTC educates deaf and hard-of-hearing children in a classroom together with typically hearing children. The program with the blended classroom is designed specifically to benefit deaf and hard-of-hearing children in learning to speak and understand spoken language by immersing them in a rich environment of speech by both adult teachers and peer students.

As a child with a disability, A.O. was entitled to a free appropriate public education when she turned three years old in January 2020. 20 U.S.C. § 1412(a)(1)(A). The school district began developing an individualized education program for her by performing several assessments of A.O.

in November 2019. Those assessments indicated that her language skills were still emerging and that she was not yet ready for a general classroom environment, at least not without supports and services.

On December 10, 2019, A.O.'s parents met with the school district's specialists to discuss A.O.'s individualized education program in the public schools. At the meeting, school officials shared their assessments of A.O., their proposed educational goals for A.O. in the coming year, and their recommended educational placement and services. A.O.'s parents had the opportunity to ask questions, and at the end of the meeting, school officials gave A.O.'s parents a written proposed individualized education program that was finalized during the meeting.

The school district recommended placing A.O. for 22.5 hours per week in a special education preschool classroom for deaf and hard-of-hearing students at Saticoy Elementary School, a public school that serves both deaf and hard-of-hearing students and typically hearing students. At Saticoy, A.O. would not have been in a blended classroom with typically hearing students, but she would have been with hearing peers for thirty minutes per day at recess. She would also have attended music, art, and library classes with hearing peers once per week for thirty minutes each, as well as attended occasional holiday parties with them. According to the proposed individualized education program, A.O. would have spent 85% of her time at Saticoy outside of general education with typically hearing children.

The school district's proposed individualized education program also provided that A.O. would receive language and speech therapy one to ten times per week for a total of thirty minutes per week and audiology services one to five times

per month for a total of twenty minutes per month. The document did not specify whether A.O. would receive language and speech therapy individually or in a group. Instead, the document listed the service delivery model for speech therapy as "Direct Service (Collaborative)," a term the written proposal did not define.[1]

School district officials had explained at the meeting with A.O.'s parents that she would receive speech and language therapy and audiology services. They did not, however, inform A.O.'s parents in the meeting that she would receive speech therapy one to ten times per week and audiology services one to five times per month, nor did they explain how those ranges would be implemented in practice. A.O.'s parents discovered those frequency ranges only when they returned home from the meeting and studied the school district's written proposal. At the later administrative hearing, A.O.'s mother testified that, upon reading the document, she did not understand how often her daughter would receive speech and language therapy and audiology services.

After the meeting that produced the proposed individualized education plan, A.O.'s parents told the school officials that they needed time to consider the district's offer. A meeting was scheduled for the following week, which A.O.'s mother later canceled. On January 21, 2020, a district official sent a message to A.O.'s mother asking whether the parents had filled out the document's consent page and whether they had any questions. A.O.'s mother replied that they needed more time.

---

[1] An asterisk appears after "Direct Service (Collaborative)," but no note in the document explains the term.

On January 27, A.O.'s parents returned the consent page saying that they rejected the district's proposed program. The parents explained that they thought the offered program was "too restrictive" and would deny A.O. "an educational program with typical, hearing peers." They also said that the services offered were insufficient because they thought A.O. needed one hour of individual speech therapy per week. The parents informed the school district that they would provide alternative services for A.O. and seek reimbursement. After she turned three, A.O. enrolled in the private JTC program with its blended classroom.

A.O.'s parents filed a due process complaint under 20 U.S.C. § 1415 with the California Office of Administrative Hearings alleging that the district's proposed individualized education program for A.O. did not satisfy the IDEA. Specifically, the parents asserted that the proposed program would not provide a meaningful benefit to A.O. and would not educate her in the least restrictive environment appropriate for her because the Saticoy program would not provide sufficient interaction with typically hearing peers. A.O.'s parents also criticized the proposed program as insufficient because it did not provide individual speech therapy. They also asserted that the school district had violated IDEA procedural requirements by failing to indicate clearly the frequency and duration of speech and audiology services. They requested reimbursement for tuition at JTC and other costs.

III.  *Procedural History*

   A. *Proceedings before the Office of Administrative Hearings*

After a six-day evidentiary hearing, an administrative law judge concluded that the school district's proposed

individualized education program violated the IDEA. The judge found that the proposed program violated IDEA procedural requirements by failing to specify clearly the frequency and duration of speech therapy and audiology services, as IDEA regulations require. The judge found that this procedural violation denied A.O. a free appropriate public education because it prevented her parents from understanding the school district's offer of services.

The judge also found that the school district's proposed program at Saticoy violated IDEA's substantive requirements. The proposed program would not provide a free appropriate public education in the least restrictive environment because it offered insufficient opportunities for A.O. to spend time with her typically hearing peers. Citing witness testimony, including that of a Saticoy teacher, the judge found that A.O. needed to interact regularly with typically hearing children her age who could serve as language models for her. The judge found that the proposed Saticoy program, in which A.O. would spend 85% of her time apart from typically hearing peers, did not offer sufficient time and interaction with typically hearing peers in an academic environment for A.O. to receive a meaningful benefit. The judge also found that the school district's proposed program would not place A.O. in the least restrictive environment appropriate for her because it offered only limited interactions with typically hearing peers and that the school district failed to "consider the full continuum of appropriate placement options" for A.O. Finally, the judge found that A.O. required individual speech and language therapy and that, because the school district's proposed program did not offer that therapy on an individual basis, the proposed program would deny her a free appropriate public education. To remedy the violations, the

judge ordered the school district to amend A.O.'s individualized education program to reflect placement at JTC at the school district's expense.

B. *Proceedings in District Court*

The school district then filed this action in the district court seeking review of the administrative law judge's decision. On cross-motions for summary judgment, the district court largely affirmed the decision of the administrative law judge. The court affirmed the conclusion that the individualized education program was procedurally deficient because it did not clearly identify the duration and frequency of speech therapy and audiology services. The court also affirmed the substantive findings that the school district's proposed program would not offer A.O. meaningful educational benefits and would deny A.O. a free appropriate education in the least restrictive environment. The court reversed, however, the finding that the proposed individualized education program needed to specify that A.O.'s speech and language therapy would be provided on an individual basis.

IV. *Jurisdiction and Standards of Review*

The district court entered a final judgment, so we have jurisdiction on appeal pursuant to 28 U.S.C. § 1291. Judicial review under the IDEA is an odd creature in administrative law. The review is not limited to the administrative record, nor does the court try factual issues de novo. The statute instructs a reviewing court to receive the records of the administrative proceedings but also tells the court it "shall hear additional evidence at the request of a party" and, based on the preponderance of the evidence, "shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C). Courts must, however, give "'due weight'

to judgments of education policy" when reviewing state administrative hearing decisions. *Gregory K. v. Longview School Dist.*, 811 F.2d 1307, 1311 (9th Cir. 1987) (*quoting Board of Educ. of Hendrick Hudson Central School Dist. v. Rowley*, 458 U.S. 176, 206 (1982)). That is, federal judges are not experts in educating children with disabilities, and courts may not "substitute their own notions of sound educational policy for those of the school authorities which they review." *Rowley*, 458 U.S. at 206. Administrative findings that are thorough and careful are entitled to "particular deference." *JG v. Douglas County School Dist.*, 552 F.3d 786, 793 (9th Cir. 2008).

The administrative law judge actively participated in questioning witnesses during the six-day administrative hearing. Her 28-page written decision contained fulsome factual background and thoroughly analyzed each issue and sub-issue. *See R.B. ex rel. F.B. v. Napa Valley Unified Sch. Dist.*, 496 F.3d 932, 942 (9th Cir. 2007) ("We treat a hearing officer's findings as 'thorough and careful' when the officer participates in the questioning of witnesses and writes a decision 'contain[ing] a complete factual background as well as a discrete analysis supporting the ultimate conclusions.'" (*quoting Park ex rel. Park v. Anaheim Union High Sch. Dist.*, 464 F.3d 1025, 1031 (9th Cir. 2006))). Because we find the administrative law judge's decision to be "thorough and careful," we give the findings in the administrative record particular deference in our review.

In this case, the parties did not offer additional evidence in the district court. Under our precedents, we review the district court's conclusions of law de novo and its findings of fact for clear error, even when those findings are based on the written administrative record. *Gregory K.*, 811 F.2d at 1310; *see also, e.g., N.B. v. Hellgate Elementary School*

*Dist.*, 541 F.3d 1202, 1207 (9th Cir. 2008). Whether the district's proposed individualized education program would provide A.O. a free appropriate public education is a question of law that we review de novo. *E.g.*, *Crofts v. Issaquah School Dist. No. 411*, 22 F.4th 1048, 1053 (9th Cir. 2022); *N.B.*, 541 F.3d at 1207.

V. *Analysis*

States must comply procedurally and substantively with the IDEA. *E.g.*, *Crofts*, 22 F.4th at 1054. To determine whether a student was denied a free appropriate public education, the court assesses first "whether the IDEA's procedures were complied with and second whether the district met its substantive obligation to provide a FAPE." *Id.* Procedural violations of the IDEA can be harmless, but not if they "substantially interfere with the parents' opportunity to participate in the IEP formulation process, result in the loss of educational opportunity, or actually cause a deprivation of educational benefits…." *Id.* (*quoting Timothy O. v. Paso Robles Unified School Dist.*, 822 F.3d 1105, 1118 (9th Cir. 2016)). A school district violates the IDEA's substantive requirements when it fails to offer an individualized education program "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F.*, 580 U.S. at 403.

We address first the three issues raised by the school district: (A) whether the school district violated the IDEA by failing to specify the frequency of proposed speech therapy and audiology services; (B) whether the school district's proposed program failed to offer a meaningful educational benefit to A.O.; and (C) whether the school district's proposed program failed to place A.O. in the least restrictive environment appropriate for her. We conclude with the issue

in defendants' cross-appeal: (D) whether the school district's proposed program violated the IDEA by failing to provide for individual speech therapy.

### A. *Frequency and Duration of Services*

Recall that the school district proposed to provide A.O. with speech therapy for thirty minutes per week in one to ten sessions per week and audiology services for twenty minutes per month in one to five sessions per month. According to the school district, the frequency ranges provided additional information about how the services would be delivered, but their inclusion was not required by law. In the alternative, the school district argues that even if it procedurally violated the IDEA, the violation was harmless because A.O.'s parents were not denied the opportunity to participate in the process of formulating a proposed individualized education program for A.O.

The IDEA requires school districts to provide parents with a formal, written, and specific offer of placement. 20 U.S.C. § 1414(d)(1)(A)(i); *Union School Dist. v. Smith*, 15 F.3d 1519, 1526 (9th Cir. 1994). This requirement is "enforced rigorously" because it provides a clear record if disputes arise and because the written offer helps parents decide whether to accept or reject a proposed program. *Union School Dist.*, 15 F.3d at 1526. Regulations provide that the written program must include the projected start date for services and modifications, as well as the "anticipated frequency, location, and duration of those services and modifications." 34 C.F.R. § 300.320(a)(7).

We agree with the administrative law judge and the district court that the school district's proposed program fell short of the IDEA because it failed to specify clearly the frequency and duration of offered services. The broad

frequency ranges—one to ten sessions of speech therapy per week totaling thirty minutes and one to five sessions of audiology services per month totaling twenty minutes— provided maximum flexibility for district providers, but they also rendered the proposed program unclear.  The proposed program would have permitted A.O. to receive speech therapy in a single thirty-minute session each week, in ten sessions averaging just three minutes each, or anything in between.

As the administrative law judge observed, offering speech therapy once a week for thirty minutes is very different from offering A.O. ten three-minute sessions per week.  This is especially true given record evidence that a speech therapist would not be able to target the skills A.O. needed to develop in five- or six-minute sessions.  The school district's proposed program thus left A.O.'s parents uncertain as to both the services their daughter would receive and whether those services would even benefit her.

The school district argues that the frequency ranges provide needed flexibility, especially with a child as young as A.O.  The district cites the testimony of speech therapist Natalie Rubinstein, who explained that while she would typically deliver therapy in one thirty-minute session, she might provide two fifteen-minute sessions if the child had difficulty sitting still for a thirty-minute session.  We recognize that teaching or providing therapy, especially for such very young children, requires some flexibility.  Still, that fact does not relieve the district of its duty under the IDEA to specify the anticipated frequency and duration of services.  Reasonable clarity of these terms is essential so that parents can decide whether to accept the proposed educational program and so that they can ensure compliance with its terms. *Union School Dist.*, 15 F.3d at 1526.  The

administrative law judge did not err in finding that the frequency ranges here did not provide reasonable clarity. In light of Rubinstein's testimony, we would see nothing wrong with a range here of, say, one to three speech therapy sessions per week, retaining some flexibility, but a range of one to ten was simply too wide to provide reasonable clarity.

Moreover, the flexibility the school district seeks already exists under the IDEA. To start, the regulations require districts to specify only the "anticipated" duration and frequency of services. 34 C.F.R. § 300.320(a)(7). While they should aim to implement each student's program as written, school districts do not violate the IDEA every time they deviate from a program's terms. Only "material" failures to implement an individualized education program violate the statute. *Van Duyn ex rel. Van Duyn v. Baker School Dist. 5J*, 502 F.3d 811, 822 (9th Cir. 2007); *accord*, *Sumter County School Dist. 17 v. Heffernan*, 642 F.3d 478, 484 (4th Cir. 2011); *Houston Independent School Dist. v. Bobby R.*, 200 F.3d 341, 349 (5th Cir. 2000); *L.J. by N.N.J. v. School Bd. of Broward County*, 927 F.3d 1203, 1213 (11th Cir. 2019). We doubt that occasional, minor deviations of the kind described in Rubinstein's testimony would be deemed material. *See Van Duyn ex rel. Van Duyn*, 502 F.3d at 822 ("A material failure occurs when there is more than a minor discrepancy between the services a school provides to a disabled child and the services required by the child's IEP.").

Because the school district's proposed broad frequency ranges for speech therapy and audiology services violated the IDEA, we consider next whether the violation was harmless. It was not because the violation "seriously impair[ed] the parents' opportunity to participate in the IEP formulation process." *Timothy O.*, 822 F.3d at 1124. This

is not a case where, even though the written proposal omitted essential information, A.O.'s parents knew and understood the district's offer. *Cf. J.L. v. Mercer Island School Dist.*, 592 F.3d 938, 953 (9th Cir. 2010) (finding that parents were not denied opportunity to participate in developing an individualized education program where, though district failed to list the amount of services offered, "everyone involved in the individualized educational team—including K.L.'s parents—knew of the amounts").

After hearing the parents' testimony, the administrative law judge found as a fact that they did not understand how frequently their daughter would receive audiology and speech services, which left them "unable to decide if they agreed with the proposed services." The administrative law judge found that even school district staff did not know how A.O.'s services would be delivered. The district court agreed, finding that district officials "provided conflicting understandings regarding how the services were to be provided." A proposed individualized education program that is so unclear that neither the parents nor the district staff charged with implementing it can understand its terms substantially interferes with parents' ability to participate in formulating the program because it prevents them from understanding and assessing the school district's offer.

The school district and the dissenting opinion insist that any violation was harmless because A.O.'s parents actually participated in formulating the program and had the opportunity to ask questions at the meeting. District officials, however, did not inform A.O.'s parents of the frequency ranges at that meeting. The parents discovered the ranges only when they returned home and studied the written document they were given at the end of the meeting. The dissenting opinion asserts that A.O.'s parents could have

sought further clarification after the meeting as well, making the violation harmless. But the parents' failure to clarify an ambiguous term after the IEP team meeting took place does not relieve the school district of its obligations under the IDEA.[2]

We have often said that a school district cannot "blame a parent for its failure to ensure meaningful procedural compliance with the IDEA." *Doug C. v. Hawaii Dep't of Educ.*, 720 F.3d 1038, 1045 (9th Cir. 2013); *see also Anchorage School Dist. v. M.P.*, 689 F.3d 1047, 1055 (9th Cir. 2012) ("participating educational agencies cannot excuse their failure to satisfy the IDEA's procedural requirements by blaming the parents"). This is because "the IDEA's protections are designed to benefit the student, not the parent." *Doug C.*, 720 F.3d at 1045. Consequently, the fact that A.O.'s parents could have asked more questions

---

[2] The administrative law judge found as a matter of fact that school officials themselves did not know how the speech therapy and audiology services would be provided based on the frequency ranges written in the IEP. We are therefore skeptical that follow-up questions from the parents would have clarified the IEP enough for the parents to understand the school district's offer and thus have an opportunity to participate as mandated under the IDEA. We also do not see a limiting principle in the dissenting opinion's suggestion that parents should be obliged to ask follow-up questions until all terms of the IEP are reasonably clear, and that parents' failure to do so means they have not been denied an opportunity to participate. The statute and implementing regulations make clear that the burden is on the school district, not the parents, to ensure that parents are afforded an opportunity to participate. *See* 20 U.S.C. § 1415(a); 34 C.F.R. § 300.322(a) ("[e]ach public agency must take steps to ensure that one or both of the parents … are afforded the opportunity to participate …."). Requiring parents to ask follow-up questions would impermissibly shift the burden to the parents, essentially requiring parents to secure their own opportunities to participate.

does not excuse the school district's "failure to fulfill its affirmative obligation" to provide a clear offer of services to A.O. *See id.*[3] We agree with the administrative law judge and the district court that the school district violated the IDEA and denied A.O. a free appropriate public education by failing to specify with reasonable clarity the frequency and duration of the proposed speech therapy and audiology services.

B. *Meaningful Benefit*

We next turn to the parties' more substantive disagreements. The school district argues that the administrative law judge and district court erred in finding that the Saticoy preschool program the district offered to A.O. would not have provided her with a meaningful educational benefit, as the IDEA requires.

To comply substantively with the Act, school districts must design individualized education programs that are "reasonably calculated to enable a child to make progress

---

[3] We have consistently stressed that parents "must be involved in the IEP *creation* process," *e.g.*, *Amanda J. ex rel. Annette J. v. Clark County Sch. Dist.*, 267 F.3d 877, 891 (9th Cir. 2001) (emphasis added), and that mere "[a]fter-the-fact parental involvement is not enough," *Shapiro ex rel. Shapiro v. Paradise Valley Unified Sch. Dist. No. 69*, 317 F.3d 1072, 1078 (9th Cir. 2003), *superseded by statute on other grounds*, 20 U.S.C. § 1414(d)(1)(B). Thus, the mere possibility that parents could have asked follow-up question *after the fact* does not mean they were provided an opportunity to participate. "An IEP which addresses the unique needs of the child cannot be developed if those people who are most familiar with the child's needs are not involved or *fully informed*." *Amanda J.*, 267 F.3d at 892 (emphasis added). The ambiguities in this IEP meant that the school district did not ensure A.O.'s parents were fully informed of the contents of the proposed plan and therefore the school district impeded their opportunity to participate.

appropriate in light of the child's circumstances." *Endrew F.*, 580 U.S. at 403. An appropriate public education "does not mean the absolutely best or 'potential-maximizing' education for the individual child." *Gregory K.*, 811 F.2d at 1314, quoting *Rowley*, 458 U.S. at 197 n.21. Yet an individualized education program must still be "appropriately ambitious," and a program that offers "merely more than *de minimis*" progress violates the IDEA. *Endrew F.*, 580 U.S. at 402–03. The program must be designed to convey a "meaningful benefit" to the student. *Adams v. State of Oregon*, 195 F.3d 1141, 1149 (9th Cir. 1999).

Under California law, deaf and hard-of-hearing children are entitled to an educational program in which their "unique communication mode is respected, utilized, and developed to an appropriate level of proficiency." Cal. Educ. Code § 56000.5(b)(2). That requirement of state law is consistent with the federal IDEA and is therefore "enforceable in federal court." *Union School Dist.*, 15 F.3d at 1524. Here, A.O.'s parents are themselves typically hearing, and they communicate through spoken language. They want their daughter to communicate through spoken language. Assessments of A.O. after she received the cochlear implants indicated that is indeed a realistic goal for her. A.O. was entitled to an educational program that would offer her meaningful benefit in oral communication.

We agree with the administrative law judge and the district court that the district's proposed individualized education program denied A.O. a free appropriate public education because it did not propose to provide enough interaction with typically hearing peers for A.O. to make meaningful progress in spoken language. Bridgette Klaus, JTC's chief program officer, explained that children with

cochlear implants, if given proper support, can learn to communicate orally and be educated in general classrooms. Speech-language pathologist Jennifer Reeder testified that, to catch up with their peers, children like A.O. need "to have access to typical language models as much as possible as many hours of their day as they can."

In her thorough and careful decision, the administrative law judge credited the testimony of JTC's Klaus, who explained that deaf and hard-of-hearing children need regular interaction with typically hearing *peers* in particular. Because other deaf and hard-of-hearing children are themselves learning to communicate orally, they can offer children like A.O. only "fragmented" language models. And, while teachers do serve as language models, Klaus explained that adults' language is far more sophisticated than that of another three-year-old. It is important that children like A.O. practice communicating with children their own age so that they are socially prepared to transition to a general education classroom. Alyssa Soto, the deaf and hard-of-hearing classroom instructor at Saticoy, agreed that mainstreaming opportunities are beneficial for students like A.O.

Given the strong evidence of A.O.'s need to interact frequently with her hearing peers, we agree with the administrative law judge and district court that the proposed Saticoy program would not have offered sufficient opportunities for mainstreaming and thus for A.O. to benefit from interactions with typically hearing peers. At Saticoy, A.O. would have spent about 85% of her time in a segregated classroom with other deaf and hard-of-hearing students. She would have interacted with typically hearing peers only at recess for thirty minutes each day, in music, art, and library classes for a total of ninety minutes each week, and at

occasional holiday parties. The majority of mainstreaming would thus have taken place during recess. As the administrative law judge noted, Saticoy's playground is not designed to amplify sound. According to Reeder, it would be difficult for A.O. to hear her peers in that environment. Considering the evidence that A.O. needs frequent, regular interaction with hearing peers, the administrative law judge and the district court reasonably found that the mainstreaming opportunities offered at Saticoy were inadequate for her to receive a meaningful benefit.

The school district's and dissenting opinion's arguments to the contrary are not persuasive. First, the district and dissenting opinion argue that the administrative law judge's decision was not thorough and careful and thus not entitled to deference based on two supposed factual errors in the decision. *See post* at 42, n.2; 45–49. The district argues that, when discussing proposed mainstreaming opportunities at Saticoy, the administrative law judge did not consider the ninety minutes per week A.O. would spend in art, music, and library classes. At the administrative hearing, only one witness, teacher Alyssa Soto, mentioned art, music, and library. A different witness for the school district, Debbie Lutz, did not discuss those classes when she listed mainstreaming opportunities at Saticoy. It is not clear from the judge's 28-page written decision whether she found Lutz's testimony more credible than Soto's on this point or if she perhaps just overlooked that portion of Soto's testimony or thought it did not need to be addressed specifically.[4]

---

[4] We do not find that the judge's handling of this minor factual issue undermines the deference owed to her decision. The factual issue

In any case, the district court found that children at Saticoy do mainstream with typically hearing peers in music, art, and library each week, and that finding is not clearly erroneous.  We have therefore considered those ninety minutes in our analysis of the school district's proposed program for A.O. at Saticoy.  Those ninety minutes per week did not convince the district court to change the result, nor do they convince us to do so.  With or without them, the proposed program did not offer A.O. sufficient interaction with typically hearing peers.

The school district and dissenting opinion also assert that the administrative law judge mistakenly described students in the other preschool class at Saticoy as English language learners.  The typically hearing peers at Saticoy were enrolled in a dual language program in which they were instructed in English and Armenian.  It is not clear from the record whether or how many of those students were English language learners.  But even if the administrative law judge might have been mistaken on this point, she did not find that students at Saticoy could not serve as adequate language models for A.O.  The judge based her decision on the *amount* of mainstreaming time available at Saticoy, not the English language abilities of typically hearing peers there.

The school district and dissenting opinion argue that the administrative law judge, instead of focusing on whether the district's proposed program offered A.O. a meaningful benefit, improperly compared Saticoy to JTC's program to determine which would provide A.O. the greater benefit. We disagree.  As we read the judge's decision, she carefully

---

concerns a small fraction of the proposed plan for A.O. and appears not to have been highlighted by the parties in the hearing or their briefs to the administrative law judge.

considered A.O.'s need for peer language models and the opportunities for mainstreaming at Saticoy, and she reasonably concluded that the district's program would not provide a meaningful benefit. The school district cites the testimony of speech-language pathologist Reeder, who testified that students in a blended, immersion program like JTC's obtain "more benefit" than students placed in classrooms with only deaf and hard-of-hearing peers. The judge did not actually apply that standard, however. Instead, she concluded that the district denied A.O. a free appropriate public education because the Saticoy program, considered in its own right, simply would not allow A.O. "to make meaningful progress."[5]

Finally, the school district argues that the administrative law judge should have deferred to the expertise of the district's witnesses who testified that Saticoy would be an appropriate program for A.O. instead of relying on the testimony of JTC's Klaus. It was not unreasonable for the judge to conclude that Klaus was "qualified to opine on what

---

[5] Contrary to the dissenting opinion's depiction of our holding, we do not find that the Saticoy program would not have provided A.O. a "meaningful educational benefit" because it would have been inferior in comparison to the program offered at the John Tracy Center. *See post* at 44–45. Rather, the Saticoy program would have provided mainstreaming opportunities to A.O. only 15% of the time, with 37.5% of that limited mainstreaming time spent in an academic environment. That means the school district proposed to have A.O. spend less than 6% of her time in a mainstreamed classroom. Given the compelling evidence that A.O. needed to maximize her time interacting with typically hearing peers to reach age-appropriate auditory, speech, and language skills, we agree with the administrative law judge and the district court that the limited mainstreaming opportunities included in the Saticoy program itself would not have provided A.O. a meaningful educational benefit.

would be an appropriate program" for A.O. Klaus has a master's degree in education with credentials for teaching deaf and hard-of-hearing students. She is a certified auditory verbal therapist and has worked with deaf and hard-of-hearing students for twenty years.

The school district insists that the judge was required to defer to the opinions of its staff. As we have observed, though, "if the views of school personnel regarding an appropriate educational placement for a disabled child were conclusive, then administrative hearings conducted by an impartial decisionmaker would be unnecessary." *Ojai Unified School Dist. v. Jackson*, 4 F.3d 1467, 1476 (9th Cir. 1993). Under the IDEA, courts owe deference to administrative hearing officers in light of their expertise, but not necessarily to the witnesses for the school district that is party to the dispute. *See id.* at 1474. The Supreme Court told us in *Rowley* that courts should not substitute their own notions of sound educational policy for those "of the school authorities which they review." 458 U.S. at 206. The school authorities whose decisions courts review under the IDEA are the hearing officers, not the staff of individual school districts. *See Van Duyn ex rel. Van Duyn v. Baker Sch. Dist. 5J*, 502 F.3d 811, 817 (9th Cir. 2007) (connecting the "due weight" given to administrative decisions to the admonition in *Rowley* that courts not substitute their own notions of sound educational policy for those of the school authorities they review); *J.W. ex rel. J.E.W. v. Fresno Unified Sch. Dist.*, 626 F.3d 431, 438 (9th Cir. 2010) (same).

The school district cites no pertinent support for its ambitious assertion that the administrative law judge was required to defer to the expertise of the district's teachers over that of other experienced educators. The administrative law judge and district court did not err in concluding that the

school district's proposed program to educate A.O. at Saticoy did not offer A.O. a meaningful benefit.

C. *Least Restrictive Environment*

The school district argues next that the administrative law judge and district court erred in finding that the proposed program at Saticoy did not offer A.O. an education in the least restrictive environment appropriate for her. The IDEA requires states to educate students with disabilities in the "least restrictive environment," meaning that, to "the maximum extent appropriate," children with disabilities should be educated with children who are not disabled. 20 U.S.C. § 1412(a)(5)(A). "[S]pecial classes, separate schooling, or other removal of children with disabilities from the regular educational environment" should occur "only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." *Id.* The IDEA thus establishes "Congress's preference for educating children with disabilities in regular classrooms with their peers." *Sacramento City Unified School Dist. v. Rachel H.*, 14 F.3d 1398, 1403 (9th Cir. 1994).

The mainstreaming requirement in the IDEA can at times be in tension with the other requirement in the IDEA that schools provide programming designed individually to meet the specific needs of each child. 20 U.S.C. §§ 1412(a)(5); 1414(d). That's why we adopted a four-part balancing-test to determine if a student will be educated in the "least restrictive environment." The court balances: "(1) the educational benefits of placement full-time in a regular class; (2) the non-academic benefits of such placement; (3) the effect [student] had on the teacher and children in the regular

class; and (4) the costs of mainstreaming [student]." *Rachel H.*, 14 F.3d at 1404. The evidence here shows, however, considerably less tension between mainstreaming and providing individualized support for children like A.O. with cochlear implants. A.O. needed as much exposure to peer language models as possible so that she could catch up to her typically hearing peers. Maximizing A.O.'s mainstreaming time, with appropriate supplementary aids and services, is part and parcel of an appropriate plan to offer a meaningful educational benefit in light of her specific needs.

The administrative law judge and district court found that the school district's proposed plan for A.O. would not have placed her in the least restrictive environment. We agree. A.O.'s parents and district educators agreed that A.O. was not yet ready for a general classroom without supports or services, but the district's proposed Saticoy program would have deprived her of being educated "[t]o the maximum extent appropriate" with her non-disabled peers. 20 U.S.C. § 1412(a)(5)(A). At Saticoy, A.O. would have been placed in a segregated classroom and 85% of her time would have been spent outside general education, without typically hearing peers. Though Saticoy offered some daily and weekly opportunities for mainstreaming, as described above, those limited opportunities would have fallen well short of appropriate mainstreaming, especially in light of the evidence that A.O. would benefit greatly from as much interaction as possible with typically hearing peers. Because the school district's proposed program at Saticoy would not have mainstreamed A.O. to the "maximum extent appropriate" for her, it was not the least restrictive environment. *Id.*

The dissenting opinion argues that the 15% of the time A.O. would spend mainstreaming at Saticoy was the

"maximum extent appropriate" for A.O. to be in a regular education environment. *Post* at 54–55. To reach this conclusion, the dissenting opinion has framed the mainstreaming requirements in the IDEA as a strict binary choice—a student is either "separate" in a "special education classroom" or mainstreamed in a "regular classroom." *Post* at 52–54. The IDEA does not draw such a formalistic and binary distinction.

"The IDEA permits a more restrictive placement only if 'education in regular classes *with the use of supplementary aids and services* cannot be achieved satisfactorily.'" *D. R. ex rel. R. R. v. Redondo Beach Unified Sch. Dist.*, 56 F.4th 636, 646 (9th Cir. 2022) (*quoting* 20 U.S.C. § 1412(a)(5)(A) (emphasis in original)). "Whenever feasible, a school district must push support services into the regular classroom rather than pull students out of it." *Id.* The IDEA specifically contemplates intermediary steps between a student being educated in a special education classroom, and a student being educated in a general education classroom without any specialized assistance. In fact, "a school district may not remove a child from the regular classroom 'solely because of needed modifications in the general education curriculum.'" *Id.* (*quoting* 34 C.F.R. § 300.116(e)). That is why schools must "ensure that a continuum of alternative placements is available to meet the needs of children with disabilities." 34 C.F.R. § 300.115(a); *Poolaw v. Bishop*, 67 F.3d 830, 835 (9th Cir. 1995) (*quoting* prior version of 34 C.F.R. 300.115(a)).

No one thought that A.O. was ready for a general education classroom without supplementary aids and services. At the same time, the school district concluded it was appropriate for A.O. to mainstream with typically hearing peers for one and a half hours each week in academic

classes in art, music, and library.  It is unclear from the record what additional support, if any, A.O. would have received while in such general education classrooms.  But given the undisputed fact that A.O. was not ready for a general education environment without supplementary aids and services, clearly the district intended to provide A.O. some support during the proposed academic mainstreaming.

The question, then, is why a plan tailored to A.O.'s needs should not have called for her to spend more than one and a half hours per week mainstreaming with her peers in a classroom environment as proposed by the district, particularly if she could be provided support services during the mainstreaming.  Providing extra support to A.O. in a general education classroom does not render it a "special education classroom," as the dissenting opinion seems to assert.  Again, given the compelling evidence on how important it would be for A.O. to spend time listening to and learning to talk with typically hearing peers, the district's proposed plan did not offer the "least restrictive environment."  It failed to weigh properly the benefits of maximizing A.O.'s mainstreaming time or take into account the "continuum" of services that could be provided to ensure that more than 15% of A.O.'s time at school was spent around typically hearing peers.

On appeal, the school district invites this court to compare the relative restrictiveness of its proposed Saticoy program and the private JTC program.  In the school district's view, a "special" school like JTC is necessarily more restrictive than Saticoy's program, which is offered on a "regular" public school campus.  The issue under the IDEA, however, is not whether the school district's proposed program would have been more or less restrictive than the parents' preferred program, but whether the district proposed

to educate A.O. "[t]o the maximum extent appropriate" with non-disabled peers. 20 U.S.C. § 1412(a)(5)(A). It did not. The administrative law judge ordered the school district to place A.O. at JTC as an equitable remedy after she found that the district had failed to offer A.O. a free appropriate public education in the least restrictive environment. The school district unsuccessfully challenged the appropriateness of that remedy in the district court. It has not sought further review of that issue here.

In any event, the school district is mistaken. The district seems to argue that because Saticoy Elementary is a large, diverse public school that enrolls many non-disabled students, it is necessarily less restrictive for A.O. than the smaller, private JTC, which enrolls typically hearing students in its preschool class for deaf and hard-of-hearing students. We reject the school district's effort to measure the least restrictive environment based on the size of a school's campus or the diversity of its entire student body, or whether it is a public or private school.

What matters under the IDEA is the educational experience offered to the particular student with disabilities. The Act requires that the student be educated to "the maximum extent appropriate" with non-disabled peers. 20 U.S.C. § 1412(a)(5)(A). It matters little that A.O. would be educated on a large, diverse, public-school campus at Saticoy if she would not be able to experience that campus or to engage meaningfully with those non-disabled peers because she would be kept, for 85% of her day, in a segregated classroom. The administrative law judge had sound reasons for finding that the school district's proposal was unnecessarily restrictive for A.O., given that it offered her only minimal interaction with typically hearing peers.

The school district also insists incorrectly that the administrative law judge's finding would imply that "every specialized classroom designed for students with disabilities" would fail the least-restrictive-environment analysis unless it also enrolled general education students in that classroom. We disagree. Nothing in the judge's decision implied that the only permissible placement for A.O. was a blended classroom like that offered at JTC, much less that *every* student with special needs would require such a placement. *See Fry v. Napoleon Community Schools*, 580 U.S. 154, 170–71 (2017) (IDEA "guarantees individually tailored educational services"). The school district could have offered additional mainstreaming opportunities for A.O. within Saticoy that, while short of creating a blended classroom akin to the JTC program, might still have satisfied the least-restrictive-environment analysis. *See Daniel R.R. v. State Bd. of Educ.*, 874 F.2d 1036, 1050 (5th Cir. 1989) (IDEA does "not contemplate an all-or-nothing educational system in which handicapped children attend either regular or special education" but instead requires "schools to offer a continuum of services" and to take "intermediate steps where appropriate"). Moreover, the administrative law judge and the district court tied their reasoning quite specifically to the special need of deaf and hard-of-hearing children with cochlear implants: to spend time and interact with typically hearing peers to catch up with their abilities to speak and understand others' speech. The administrative law judge and district court did not err on this point.

D. *Individual Speech and Language Therapy*

Finally, we consider A.O.'s and her parents' cross-appeal asserting that the school district needed to specify that her speech and language therapy would be delivered on an individual basis. The administrative law judge found that

the school district had substantively violated the IDEA and denied A.O. a free appropriate public education by failing to offer individual speech therapy.  The district court reversed on this issue because it found no *procedural* violation of the IDEA.  The court noted correctly that federal regulations do not expressly require school districts to specify in an individualized education program whether services will be provided individually or in a group setting.  The district court did not address, however, the administrative law judge's substantive finding that A.O. would need individual therapy as part of any free appropriate public education for her.

The IDEA "accords educators discretion to select from various methods for meeting the individualized needs of a student" so long as those methods are "reasonably calculated to provide him with educational benefit."  *R.P. ex rel. C.P. v. Prescott Unified School Dist.*, 631 F.3d 1117, 1122 (9th Cir. 2011).  Put another way, a school district "need not specify an instructional method unless that method is necessary to enable a student to receive a FAPE."  *Crofts*, 22 F.4th at 1057.

Here, the school district's proposed program said that that A.O.'s speech therapy would be delivered as a "Direct Service (Collaborative)."  At the administrative hearing, the district's Rubinstein explained that this meant that the speech and language pathologist would see the child "directly" and would be working "collaboratively" with the teacher in the classroom toward A.O.'s goals.  Other witnesses during the administrative hearing said that "Direct Service (Collaborative)" referred to both individual or group services—or at least was ambiguous.

At oral argument, counsel for the school district told us that the label "Direct Service (Collaborative)" does not

distinguish between individual and group therapy, but that the service would not have been delivered in a group setting if A.O. had attended Saticoy. Attorney arguments are not evidence. The school district has not pointed us to any place in the record where the meaning of "Direct Service (Collaborative)" was clarified to mean individual speech therapy.

The administrative law judge found that A.O. needed individual speech and language therapy to be provided with a free appropriate public education. The judge found persuasive the testimony of Reeder, a licensed speech-language pathologist who opined that A.O. needed individual therapy to improve her articulation. Reeder explained that, to practice her pronunciation of final consonants, A.O. needed to be able to hear the therapist, which would be difficult in a loud, busy classroom. The judge also considered the testimony of the school district's Rubinstein but found that she offered no rationale for providing A.O. speech therapy in a group. Granting due deference to the careful and thorough findings of the administrative law judge, we conclude that A.O.'s speech and language therapy needed to be delivered on an individual basis for her to obtain a meaningful benefit from that service. The school district violated the IDEA by failing to offer A.O. individual speech and language therapy.

The school district's violation was substantive, not procedural, because the failure to provide a disabled student with appropriate services denies that student a free appropriate public education. *See* 20 U.S.C. § 1401(9) (defining "free appropriate public education" to include "special education" and "related services"). In their briefs in this court, the parties principally debate whether the school district committed a procedural violation of the IDEA

by failing to specify whether A.O.'s speech therapy would be delivered to her individually or in a group.

We view the issue primarily as a substantive one. The administrative law judge found a substantive violation, finding that A.O. "required individual speech and language services," and that the school district denied A.O. a free appropriate public education "by failing to offer individual speech and language services." The school district's label "Direct Service (Collaborative)" is opaque, but the evidence in the record shows that the label can mean either individual or group therapy. The proposed individual education program thus would have failed to offer A.O. the individual therapy she required. In any event, we agree with A.O. that there still would have been a procedural violation because the opaque reference in the proposed individual educational plan did not allow the parents to evaluate what the school district was proposing for an important aspect of their child's education. The administrative law judge reasonably determined that the school district denied A.O. a free appropriate public education in this respect.

## Conclusion

The school district violated the IDEA in several ways: by failing to indicate clearly the frequency and duration of the services offered, by failing to offer A.O. a meaningful benefit, and by not placing her in the least restrictive environment appropriate for her. We AFFIRM the district court's judgment on these issues. We REVERSE the district court's finding that the individualized education program was not required to specify that A.O. would receive individual speech and language therapy. The case is REMANDED to the district court to modify its judgment

accordingly and for any further appropriate proceedings consistent with this opinion.

---

COLLINS, Circuit Judge, dissenting:

The majority holds that, in multiple different respects, Plaintiff Los Angeles Unified School District ("LAUSD" or "the school district") denied a free appropriate public education ("FAPE") to Defendant A.O., in violation of the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, *et seq*. Because, in my view, LAUSD's proposed individualized education program ("IEP") did not deny A.O. a FAPE, I respectfully dissent.

Before turning to the specific asserted deficiencies identified by the majority, I think it is important to emphasize the unusual framework for judicial review that applies under the IDEA. "Unlike other cases reviewing administrative action, in IDEA cases, the Ninth Circuit does not employ a highly deferential standard of review; rather, it gives due weight to the state administrative proceedings." *Crofts v. Issaquah Sch. Dist. No. 411*, 22 F.4th 1048, 1053 (9th Cir. 2022) (simplified). In assessing the "due weight" to give to "administrative findings," we give deference to findings of the administrative law judge ("ALJ") that are "thorough and careful." *Doug C. v. Hawaii Dep't of Educ.*, 720 F.3d 1038, 1042 (9th Cir. 2013). To the extent that the district court, upon its review of the matter, makes specific findings of fact, we review those findings for clear error. *Id*. But on the ultimate question whether a proposed IEP provides a FAPE, we apply de novo review. *Crofts*, 22 F.4th at 1053; *see also Amanda J. ex rel. Annette J. v. Clark Cnty. Sch. Dist.*, 267 F.3d 877, 887 (9th Cir. 2001). Nonetheless,

we must also keep in mind that, when assessing whether a FAPE has been denied, "we are not free 'to substitute [our] own notions of sound educational policy for those of the school authorities which [we] review.'" *Amanda J.*, 267 F.3d at 887 (quoting *Board of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206 (1982)).  Under these standards, I disagree with each of the majority's grounds for holding that LAUSD denied a FAPE to A.O.

## I

I disagree with the majority's conclusion that LAUSD denied A.O. a FAPE by using unduly broad frequency ranges in describing how often particular services would be provided to A.O.

Under the IDEA, an IEP must include "the anticipated frequency, location, and duration" of the "special education and related services and supplemental aids and services . . . to be provided to the child, or on behalf of the child."  20 U.S.C.  § 1414(d)(1)(A)(i)(IV), (VII).   With respect to speech and language services, LAUSD's proposed IEP stated that A.O. would be provided such services for a total of 30 minutes per week, to be given in 1–10 sessions per week.  As to "audiology services," the proposed IEP stated that they would be provided for a total of 20 minutes per month, with that total broken into 1–5 sessions per month.  The majority holds that, while a frequency band of 1–3 sessions for a total of 30 minutes of speech and language services would satisfy the statutory requirement to adequately specify the "anticipated frequency . . . and duration" of such services, a band of 1–10 sessions is too broad, thereby rendering materially "unclear" the sufficiency of the services being proposed.  *See* Opin. at 16–17.  According to the majority, 10 sessions would suggest

that only 3 minutes of services would be provided per session, which could impair their quality. *See* Opin. at 16. The majority further concludes that the band of 1–5 sessions for a total of 20 minutes of audiology services is also insufficiently clear. *See* Opin. at 15–16.

Even assuming that LAUSD's proposed frequency ranges were unduly broad and thereby violated the IDEA's requirement to adequately specify the "anticipated frequency . . . and duration" of the services, that does not suffice to establish that A.O. was ultimately denied a FAPE. Rather, as the majority recognizes, a violation of the IDEA's *procedural* requirements results in the denial of a "free appropriate public education only if" that violation:

> (I) impeded the child's right to a free appropriate public education;
>
> (II) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education to the parents' child; or
>
> (III) caused a deprivation of educational benefits.

20 U.S.C. § 1415(f)(3)(E)(ii); *see also Timothy O. v. Paso Robles Unified Sch. Dist.*, 822 F.3d 1105, 1118 (9th Cir. 2016). The majority holds that the second of these alternatives is satisfied here, *see* Opin. at 17–20, but I disagree.

The majority notes that the ALJ made a factual finding that A.O.'s parents were confused by the breadth of the ranges—which, as explained, could be construed as

suggesting completely cursory, and therefore inadequate, sessions—and that the parents were therefore unable sufficiently to "assess[] the school district's offer." *See* Opin. at 18. But to constitute a denial of a FAPE, this lack of clarity must have "*significantly* impeded the parents' *opportunity* to participate in the decisionmaking process." 20 U.S.C. § 1415(f)(3)(E)(ii)(II) (emphasis added). I do not see how that standard can be said to have been met in this case. Because the defect here involves a lack of clarity arising from an issue about how to construe these frequency ranges in light of the stated total minutes, the matter is one that could have been further clarified simply by asking follow-up questions about that point. That is, the lack of clarity here may have been a technical violation of the statute, but it did not deprive the parents of the *opportunity* to participate in the process.

The majority rejects this conclusion on the ground that it amounts to "blam[ing] [the] parent[s]" for the school district's error. *See* Opin. at 19 (quoting *Doug C.*, 720 F.3d at 1045). That is wrong. Here, the school district—and the school district alone—was responsible for the improperly broad frequency ranges in the proposed IEP, and I have not in any way sought to "blame the parents" for that erroneous lack of clarity. *Cf. Doug C.*, 720 F.3d at 1045 (rejecting school district's effort to blame the parent for the school district's underlying procedural failure to include that parent in the key IEP meeting). But the statute squarely requires us to ask whether that error "significantly impeded the parents' *opportunity* to participate in the decisionmaking process," 20 U.S.C. § 1415(f)(3)(E)(ii)(II) (emphasis added), which requires us to ask whether, *after* the error was committed, the parents still had an "opportunity to participate" in that process in a meaningful way. Given that parents are, by

statute, part of the "IEP Team" that is responsible for "developing each child's IEP," 20 U.S.C. § 1414(d)(1)(B), (d)(3)(A), that opportunity to participate necessarily includes the ability to ask simple follow-up questions that might be able to resolve the problematic lack of clarity. There is no contention here that A.O.'s parents were in any way prevented from asking such questions; indeed, A.O.'s mother did not deny that she understood that she could raise issues about the written IEP after it had been provided to her. On this record, A.O.'s parents' "opportunity to participate" in the development of the IEP cannot be said to have been "impeded," much less "significantly" so.

Furthermore, there is no basis in the record to conclude that the mere lack of clarity in the broad frequency ranges actually "impeded [A.O.'s] right to a free appropriate public education" or "caused a deprivation of educational benefits." 20 U.S.C. § 1415(f)(3)(E)(ii). That might arguably have been the case if, for example, follow-up questions could not be expected to have resulted in a clarification that would have eliminated the underlying uncertainty about the adequacy of the proposed services. But no such situation is presented here. On the contrary, when the school district was pressed on the point in the context of the administrative process, it became clear that no one actually expected that as many as 10 speech and language service sessions would be required. Because the substantive adequacy of the underlying services here could potentially have been resolved by follow-up questions, I do not see how the unduly broad ranges can be said to have actually impeded A.O's right to a FAPE or deprived her of educational benefits.

Accordingly, because none of the statutory alternatives for establishing a denial of a FAPE were met, there was no

such denial and any procedural error on this score was harmless.

## II

In my view, the majority also errs in reversing the district court's conclusion that LAUSD did not deny a FAPE to A.O. by failing to specify that A.O.'s speech and language services would be provided in a strictly individualized setting.

As we have held, school districts are entitled to exercise their educational judgment in determining which methodology to use in providing particular services that are properly included in an IEP. *Crofts*, 22 F.4th at 1056; *see also Rowley*, 458 U.S. at 208. Accordingly, school districts "need not specify an instructional method unless that method is *necessary* to enable a student to receive a FAPE." *Crofts*, 22 F.4th at 1057 (emphasis added). Here, A.O. contends that, unless her speech and language services were provided in a strictly individualized setting—*i.e.*, not inside her classroom—those services would be so inadequate as to deny her a FAPE. The ALJ erred in accepting that proposition.

On this score, the ALJ stated that A.O. needed "individual therapy" rather than services "in a group setting," because Jennifer Reeder, a speech pathologist, testified that, as the ALJ put it, "for [A.O.] to work on articulation she needed to hear, learn, and use the articulation sounds she was working on with a therapist." But as the testimony offered by LAUSD's speech pathologist (Natalie Rubinstein) made clear, LAUSD did not propose providing speech and language services to multiple children at the same time, and the ALJ erred to the extent she relied on that view. Reeder construed the IEP's reference to

"collaborative" services as meaning "group" services, but Rubinstein explained that the IEP described the services as "direct" and "collaborative" because "the speech and language pathologist would need to see the child directly" and would also need to work "collaboratively . . . with the teacher in the classroom."[1]   There is thus no basis for Reeder's or the ALJ's supposition that LAUSD proposed to have multiple students receive such services at the same time.[2]

Although Reeder also stated that she did not think that these services could "be offered within the classroom setting" because "classrooms are very busy and usually loud places," the ALJ's decision does not explicitly mention that particular point.  But even assuming that the ALJ relied on that statement, it still does not establish that a strictly individualized setting—*i.e.*, one that is physically outside the classroom walls rather than merely conducted separately from other students within those walls—is *necessary* to enable A.O. to receive a FAPE.  *Crofts*, 22 F.4th at 1057.  A generalized statement that classrooms are "usually loud" does not prove that in-the-classroom provision of speech and language services in the particular context of the program at issue here *cannot* work.  But absent such evidence, an

---

[1] Further, in response to a specific question on this point at oral argument, LAUSD's counsel expressly stated that "it was not a group service" that was being proposed.  *See* Opin. at 33–34.  And to the extent that the clarity of the IEP's description raises a potential issue of a procedural violation, I reject that contention for the reasons explained below.  *See infra* note 3.

[2] This provides a further reason—in addition to the ALJ's other multiple errors, discussed below—for concluding that the ALJ's ruling is not as careful and thorough as the majority claims.  As such, I give it little deference here.

individualized setting has not been shown to be a *necessary* detail for the provision of a FAPE. The IEP therefore did not deny A.O. a FAPE by omitting that specification, and I would affirm the district court's judgment on this point.[3]

## III

I also disagree with the majority's further conclusions that LAUSD's proposed program at Saticoy Elementary School ("Saticoy") (1) would not have provided A.O. with a "meaningful educational benefit"; and (2) would not have placed A.O. in the "least restrictive environment."

## A

As the Supreme Court has explained, the IDEA's *substantive* requirement to provide a FAPE "is satisfied . . . if the child's IEP sets out an educational program that is 'reasonably calculated to enable the child to receive educational benefits.'" *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 394 (2017) (quoting *Rowley*, 458 U.S. at 207). But it is not sufficient to offer a "merely more than *de minimis*" level of educational benefit; rather, the IDEA "requires an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Id*. at 402–03. In the context of a "child who is deaf or hard of hearing," the IEP must specifically "consider the child's language and

---

[3] To the extent that A.O. also presents this claim as one involving the procedural error of failing to describe the services with sufficient clarity, I would reject that contention. For the reasons I have stated, the omission does not go to the adequacy of a FAPE, and it is therefore a detail that did not need to be included in the IEP. And to the extent that the IEP was not clear as to what a "collaborative" approach to delivering these services meant, that error would be harmless for reasons similar to those discussed above in relation to the frequency bands.

communication needs, opportunities for direct communications with peers and professional personnel in the child's language and communication mode, academic level, and full range of needs, including opportunities for direct instruction in the child's language and communication mode." 20 U.S.C. § 1414(d)(3)(B)(iv).

While a "meaningful educational benefit" is thus required, *see D.O. ex rel. Walker v. Escondido Union Sch. Dist.*, 59 F.4th 394, 417 (9th Cir. 2023) (citation omitted), we have also cautioned that a FAPE "does not mean the absolutely best or 'potential-maximizing' education for the individual child." *Gregory K. v. Longview Sch. Dist.*, 811 F.2d 1307, 1314 (9th Cir. 1987) (quoting *Rowley*, 458 U.S. at 197 n.21). The judgment required by the IDEA is thus *not* a comparative one—*i.e.*, whether the proposed program is the best of the available options. Rather, the question is an absolute one—*i.e.*, whether, considered on its own merits, the proposed program provides a meaningful educational benefit. As we made clear in *Gregory K.*:

> Our de novo review . . . must focus primarily on the District's proposed placement, not on the alternative that the family preferred. Even if the [family's preferred option] were better for [the student] than the District's proposed placement, that would not necessarily mean that the placement was inappropriate. We must uphold the appropriateness of the District's placement if it was reasonably calculated to provide [the student] with educational benefits.

*Gregory K.*, 811 F.2d at 1314.

Like the ALJ and the district court, the majority loses sight of these standards and effectively holds that, because, in its view, the Saticoy program is inferior to the program at A.O.'s parents' preferred placement—the John Tracy Center ("JTC")—the Saticoy program does not provide a FAPE. Although the majority vigorously denies that either the ALJ's or its own reasoning rests on such a comparative judgment, *see* Opin. at 24–25, I do not think that this claim withstands analysis.

Certain points are, for present purposes, undisputed. First, as the ALJ noted, the parties agreed "that a regular education classroom without supports and services was not appropriate" for A.O. As the ALJ noted, there was *no* testimony, from either side, that "a general education preschool class would be appropriate for [A.O.]." Second, A.O. has not challenged the ALJ's determination that she failed to show that the Saticoy program would have led to her "regress[ing] in her speech and language abilities." Third, A.O. has not challenged the ALJ's determination that the half-day length of the Saticoy program did not deny her a FAPE. As the ALJ explained, A.O. "did not prove there was any significant difference in the length of academic time between the John Tracy Center and the Saticoy program," because the "difference in duration of instructional time between the two programs was minimal." Against this agreed-upon backdrop, the question, then, is whether the level of benefit that would concededly have been provided by the Saticoy special education program would have been "meaningful" under the *Endrew F.* standard.

In answering that question in the negative, the ALJ relied solely on the conclusion that the Saticoy program would not provide "adequate peer language modelling for [A.O.] to make meaningful progress." That was true, the ALJ

concluded, because, unlike the JTC program, the Saticoy program did not "offer[] any *academic* mainstreaming opportunities" (emphasis added). According to the ALJ, "[t]he only interaction [A.O.] would have with typical hearing peers [at Saticoy] was at an occasional holiday celebration and unstructured recess time." The recess time provided inadequate peer language opportunities, the ALJ concluded, because it was "not in an acoustically sensitive environment to allow [A.O.] equal opportunity for communication access." The ALJ also stated that "most" of the "typically developing peers" at Saticoy "were English language learners."

As LAUSD notes, the ALJ's analysis is predicated on several errors. First, the ALJ simply overlooked the unrebutted evidence from the special education preschool teacher at Saticoy, Alyssa Soto, that the students in the special education program were also combined with the "typical hearing children" in the Saticoy preschool class for several additional activities, including "music," "art," and "library," for about 30 minutes each, once each week. Those additional 90 minutes per week of mainstreaming opportunities with peers were improperly disregarded by the ALJ. That undermines her substantive conclusion, and it also confirms that her assessment of the record does not demonstrate the sort of carefulness that would warrant our giving it much deference.

In response, the majority wrongly contrives a supposed conflict in the testimony on this point, claiming that a different LAUSD witness, who described herself as an "itinerant" teacher who went from classroom to classroom for different grades, "did not discuss those classes when she listed mainstreaming opportunities at Saticoy." *See* Opin. at 23. The majority's suggestion is that this itinerant teacher's

failure to mention those additional activities is affirmative testimony that there was no such additional mainstreaming at Saticoy. This flawed contention is apparently based on the following response that the teacher gave when she was asked "what's your understanding of whether or not" A.O. would have "that opportunity" to "interact with typical peers on the playground or otherwise":

> So they do have an opportunity, um, the teachers team up for holidays and they could, depending on the schedules, um, have interaction on the yard every day. Um, *it depends on how they set their schedules up.* So there is opportunities.

Contrary to the majority's insinuation, this response did not even purport to be an exhaustive description of the mainstreaming opportunities at Saticoy; it was an affirmative answer to the yes/no question "whether or not" there would be such opportunities, and the witness expressly stated that the exact opportunities would "depend[] on how they"—*i.e.*, "the teachers"—"set their schedules up." Far from contradicting Soto's testimony about the exact structure and schedule of *her* classroom, this testimony defers to it. The majority's claimed conflict is thus itself clearly erroneous.

The district court's analysis on this point is not much better. Although the district court acknowledged the additional "ninety minutes of weekly blended student interactions" in "music, art, [and] library,"[4] it claimed that

---

[4] Despite its gratuitous and erroneous claim of a conflict in the testimony on this point, the majority ultimately concedes that the finding of an additional 90 minutes per week is not clearly erroneous. *See* Opin. at 24.

the ALJ's ultimate conclusion was still correct because the "ALJ properly found that the total amount of mainstreaming per week in the Saticoy Program was 'occasional,' and therefore insufficient." On the cited page from which this quotation was taken, the ALJ stated: "The only interaction [A.O.] would have with typical hearing peers was at an *occasional* holiday celebration and unstructured recess time" (emphasis added). What the ALJ found was that the "holiday celebration[s]" were "occasional"; the ALJ did *not* conclude that the *90 minutes per week of art, music, and library* time could be dismissed as "occasional." The district court thus plainly misread the ALJ's decision and failed properly to assess the significance of that additional 90 minutes.

Second, the ALJ erred in stating that the regular preschool program at Saticoy consisted mostly of students who "were English language learners." There is no evidence in the record to support the ALJ's conclusion that these preschool students lacked fluency in English. The record instead shows that the regular preschool program was a dual-language program involving both English and Armenian, and Alyssa Soto testified that, during the joint sessions, those students "[o]nly ever [used] English." This additional patent error further vitiates any claim that the ALJ's analysis was "careful" or should be given deference. The majority nonetheless asserts that this erroneous factual statement made no difference to the ALJ's analysis. *See* Opin. at 24. This confidence is misplaced. In her ultimate conclusion, the ALJ stated that, "*without* mainstreaming opportunities with typical hearing peers, [LAUSD] denied [A.O.] a FAPE because it did not offer an appropriate classroom with *adequate* peer language modelling for [A.O.] to make meaningful progress." Nothing in that sweepingly worded

sentence provides any assurance that the ALJ did not rely on the mistaken premise that the typical-hearing peers at Saticoy were fluent only in Armenian. And nothing in the district court's analysis takes this error into account either.

Once these errors are set aside, the only remaining criticism of the Saticoy program that was offered by the ALJ or the district court was that, unlike the unique JTC program, the Saticoy program did not include typically-hearing students *in the special education classes*. But that is purely a comparative point, and while it may suggest that the JTC program was preferable, and perhaps optimal, for A.O., we have consistently held that the IDEA does not require that the school district provide the very best possible program. *Gregory K.*, 811 F.2d at 1314. Rather, it only requires that the program provide a meaningful benefit, *i.e.*, a program that is "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F.*, 580 U.S. at 403. The record evidence confirms that the Saticoy program meets that standard. The ALJ acknowledged that LAUSD based its placement recommendation on "assessment results," and numerous witnesses for the school district testified that the various features of the Saticoy program, including the acoustically designed classrooms, the trained and credentialed staff, and the opportunities for peer interaction, were reasonably calculated to provide appropriate educational benefits. Alyssa Soto also testified about the program's prior successes in helping students to later mainstream into regular classrooms.

Moreover, the chief witness on whom the ALJ relied in rejecting the adequacy of the Saticoy program—Bridgette Klaus, who is JTC's chief programs officer—conceded that A.O. "would receive educational benefit in language and

speech" in a classroom such as Saticoy.  Moreover, Klaus further conceded that she did not personally "know the Saticoy program" and did not "have any knowledge" of the full scope of its opportunities for interacting with typical-hearing peers.  Her view was that deaf and hard-of-hearing ("DHH") children should be "with their hearing peers to the greatest extent possible"—which is a comparative and maximalist judgment, and not one focused on whether a given program is sufficient or appropriate.  Jennifer Reeder, a speech pathologist whose testimony the majority cites, similarly opined that JTC would provide "*more* benefit" given the additional opportunity for interaction with typical-hearing peers (emphasis added).  But the fact that these witnesses thought that JTC would be a *better* option does not establish the distinct proposition that Saticoy would not have sufficiently provided a meaningful benefit, and neither of these witnesses provided testimony that would support that view.

The majority's unfortunate precedential opinion now effectively establishes that, in order to provide a FAPE for students such as A.O., school districts *must* provide the only additional element that JTC offers, which is reverse mainstreaming, *i.e.*, inclusion of nondisabled students into the DHH special education class.  That holding cannot be correct.  As one of the amici curiae in this case notes, it is not entirely clear to what extent such reverse mainstreaming is even consistent with California law, which generally precludes placing nondisabled children into special education classrooms.  *See* CAL. EDUC. CODE § 56364.2. A.O. argues that the IDEA overrides that judgment, which seems to me to be a rather remarkable contention.  Even if the IDEA would ordinarily be thought to override conflicting

provisions of state law,[5] something is fundamentally wrong with our interpretation of the IDEA if it would lead to the preemption of *this* sort of state law, which generally blocks placing nondisabled students into special education classes that may not be appropriate for them. Indeed, under A.O.'s and the majority's view, the IDEA would seemingly require the *creation* of such reverse-mainstreaming opportunities if they do not already exist.

The majority's opinion is further flawed in that it effectively second-guesses the educational policy judgments of school officials, contrary to the Supreme Court's explicit direction that courts generally must defer to "the application of expertise and the exercise of judgment by school authorities." *Endrew F.*, 580 U.S. at 404. The majority instead takes the view that the caselaw requires *only* deference to the "hearing officers, *not* the staff of individual school districts." *See* Opin. at 26 (emphasis added). That is incorrect. While we have held that deference may be warranted to the "educational expertise" of ALJs in IDEA cases, *see Deal v. Hamilton Cnty. Bd. of Educ.*, 392 F.3d 840, 865 (9th Cir. 2004), that does not mean that deference is not *also* warranted to the school officials involved in preparing the IEP. On the contrary, in explaining the deference that is required under the IDEA, the Supreme Court in *Rowley* emphasized the respect that should be given to judgments made by "state and local educational agencies in cooperation with the parents or guardian of the child." *Rowley*, 458 U.S. at 207. That language obviously refers to

---

[5] A.O. does not discuss the potential applicability of the IDEA's carve-out for conflicting state laws "respecting the provision of public education to children" who are "aged 3 through 5." 20 U.S.C. § 1412(a)(1)(B)(i). I express no view on that point.

the school district staff who are part of the IEP Team, and not to the ALJ in a subsequent administrative proceeding. In addition, for the reasons I have already explained, the ALJ in *this* case does not deserve any deference. And the majority's further statement that deference to school officials cannot be "conclusive," *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1476 (9th Cir. 1993), is a strawman argument that cannot justify the majority's failure to give the appropriate non-conclusive deference.

**B**

For similar reasons, I think that the majority errs in concluding that LAUSD failed to provide A.O. with the "least restrictive environment." 20 U.S.C. § 1412(a)(5) (heading).

As described in the IDEA, the requirement to use the "least restrictive environment" means that,

> To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

20 U.S.C. § 1412(a)(5)(A). Nothing in this language contemplates that school districts, in considering appropriate

education plans for a student—such as A.O.—who concededly *requires* special education classes, must consider or employ *reverse* mainstreaming in which "children who are not disabled" are placed into such "special classes" for "children with disabilities." *Id*. To the contrary, the language of this provision addresses the distinction between "special classes" and "separate schooling," on the one hand, and the "regular educational environment" on the other. *Id*. Thus, as we have recognized, this "least restrictive environment requirement" requires the use of a "*regular* classroom," rather than "a special education classroom," to the "maximum extent appropriate." *D.R. ex rel. R.R. v. Redondo Beach Unified Sch. Dist.*, 56 F.4th 636, 643 (9th Cir. 2022) (emphasis added) (citation omitted). But to the extent that "special classes" *are* required, and a "regular educational environment" is not an appropriate option, nothing in this statutory provision goes further and requires school districts to *then* consider the option of making things better for the disabled child by adding *nondisabled* children to those special classes.

The statute's focus on the distinction between special classes and the regular educational environment is underscored by the fact that the four factors that we have long considered in analyzing this requirement are *all* focused on comparing the regular classroom to a special education classroom:

> We have established a four-factor test to determine whether a school district has complied with the least restrictive environment requirement. The first and most important factor compares the academic benefits a child receives from placement *in*

>*the regular classroom* with the academic
>benefits available *in a special education
>classroom*.  The second factor considers the
>non-academic benefits a disabled child
>derives from being educated *in a regular
>classroom*, such as the development of social
>and communication skills from interaction
>with nondisabled peers.  The third factor
>weighs the potential negative effects a
>disabled child's presence may have on the
>education of *other children in the [regular]
>classroom*.  The fourth factor considers the
>costs to the school district of providing the
>supplementary aids and services necessary to
>educate a disabled child *in the regular
>classroom*.

*Id.* at 643 (emphasis added) (citing *Sacramento City Unified
Sch. Dist. v. Rachel H.*, 14 F.3d 1398, 1404 (9th Cir. 1994)
(other citations and internal quotation marks omitted)).

Here, all agree that A.O. requires "special classes" and
cannot be placed into a "regular educational environment."
20 U.S.C. § 1412(a)(5)(A).  Nor is there any contention that
the Saticoy program does not adequately provide, *outside the
context of the required "special classes,"* the "maximum"
appropriate extent of "educat[ion] with children who are not
disabled."  *Id.*  As explained earlier, the Saticoy program
combines the DHH and nondisabled students together for
art, music, library, recess, and celebrations, reflecting a
proper and uncontested assessment that a special education
environment is not required for those particular activities.
The *only* respect in which A.O. complains that the Saticoy
program does not mainstream DHH students is in the *special*

*education portion of the program* that all agree that A.O. needs. Because the Saticoy program thus mainstreams the students to the "maximum extent appropriate," it satisfies the "least restrictive environment" requirement.

In reaching a contrary conclusion that LAUSD had to do more than what it did in order to provide a FAPE, the majority necessarily holds that the IDEA *required* LAUSD to offer A.O. special education classes that included nondisabled children.[6] Thus, under the majority's reading, the statutory requirement to ensure that, "[t]o the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled," 20 U.S.C. § 1412(a)(5)(A), may sometimes require that nondisabled students be placed into special education classes. I am aware of no precedent that supports this novel holding, which lacks any basis in the statutory text, and the majority does not cite any such authority.

*     *     *

For the foregoing reasons, I respectfully dissent.

---

[6] The majority vaguely suggests that LAUSD should perhaps have provided *regular*-classroom academic opportunities to A.O. with unspecified "supplementary aids and services" to make that possible. *See* Opin. at 30. But A.O. has not raised such an argument, and the ALJ did not rely on any such theory either. On the contrary, the ALJ flatly stated that "[n]one of [LAUSD's] witnesses, [A.O.'s] Parents, or [A.O.'s] own experts, opined that a general education preschool class would be appropriate for [A.O.]." Moreover, in concluding that additional "academic mainstreaming opportunities" were available for A.O., the *only* evidence that the ALJ cited consisted of evidence related to JTC's unique program, which placed regular hearing students into a special education classroom.